Gabriella Simone ALLEN, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000353–DG.

Supreme Court of Kentucky.

March 21, 2013.

Daniel Jay Canon, Clay, Frederick, Adams, PLC, Louisville, KY, for Appellant.

Jack Conway, Attorney General, Courtney J. Hightower, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, for Appellee.

Opinion of the Court by Justice NOBLE.

The Appellant, Gabriella S. Allen, was convicted of perjury for lying in a criminal complaint and theft by deception for obtaining the discharge of a vehicle loan by lying to the finance company about whether her name had been forged on the loan documents. On appeal, she claims entitle-

ment to a directed verdict on the ground that there was no proof that she obtained any property by the discharge of the loan. She also claims that the trial court erred in excluding evidence about the complaining witness's prior convictions for possession of forged instruments and giving police a false name, which prevented her from establishing her defense. This Court concludes that the evidence was sufficient to avoid a directed verdict but that Allen was entitled to ask about the witness's convictions on cross-examination, and reverses.

## I. Background

Gabriella Allen was a Louisville Metro Police Officer who had a short romantic relationship with Curtis Wayne Weaver in late 2004 and early 2005. During that relationship, Weaver obtained a 2002 Ford F–150 pick-up truck from Oxmoor Toyota in Louisville, Kentucky. The truck was financed through a separate company, Toyota Motor Credit Corporation.

Weaver needed a co-signer on the loan to complete the purchase. Allen's signature was included on the loan documents as the co-signer, though she disputes that she actually signed the documents and claims her signature was forged, which lies at the core of the criminal charges against her in this case. The transaction was completed on January 25, 2005. Weaver had the truck for two years, and made the payments until he was injured at work. As a result, the truck was repossessed.

In December 2006, Allen went to the Jefferson County Attorney's office and swore under oath on a notarized criminal complaint that Weaver had forged her sig-

nature on the loan documents. About a week later, Allen sent various documents to Toyota Motor Credit, which held the loan on the truck, alleging that Weaver had forged her signature on the loan documents, which included some of the financing documents, an affidavit of identity theft, and proof of her residence and identification. Toyota's fraud department investigated the matter and concluded that Allen had been the victim of fraud. As a result, Toyota forgave the debt against her and closed her account. The discharged debt totaled $7,487.84.[1]

In February 2007, Weaver was arrested on the complaint. The charges against him, however, were eventually dismissed. He claimed this was because he convinced the prosecutor that Allen had actually signed the documents.

In March 2008, Allen and Weaver had a verbal altercation outside Club Cedar, a nightclub in Louisville. Weaver claimed that Allen threatened to kill him or have him killed.

As a result, Weaver filed a complaint with the Louisville Metro Police Department. The matter was investigated by the Public Integrity Unit. As part of the investigation, the unit interviewed Allen, who claimed that Weaver had forged her name on aforementioned loan documents. Her story, however, included inconsistencies about the nature of her relationship with Weaver, and whether she had ever gone to Oxmoor Toyota with him and whether she had signed anything on his behalf.[2] As a result of that investigation, Allen was charged with first-degree perjury for swearing a false complaint against Weaver; theft by deception over $300 [3] for giv-

---

1. Though the testimony at trial is not clear on this point, this amount appears to represent the unpaid debt obligation remaining on the loan after the repossession of the truck.

2. A recording of this interview was played for the jury.

3. At the time Allen was charged and tried, the threshold for felony theft was $300. That limit has since been raised to $500.

ing false information to Oxmoor Toyota and thereby depriving Oxmoor Toyota of property;[4] and terroristic threatening stemming from the incident with Weaver outside the nightclub.

At trial, Allen was acquitted of terroristic threatening but found guilty of the other two charges. She was sentenced to three and a half years in prison, which was probated for five years.

On appeal, Allen challenged her conviction on three grounds. First, she claimed the trial court erred in not allowing evidence of the specific nature of Weaver's prior convictions, which consisted of multiple instances of felony criminal possession of a forged instrument and misdemeanor giving a false name to a peace officer. Second, she claimed that the trial court should have granted a directed verdict on the theft charge because the Commonwealth presented insufficient proof that she obtained any property. Third, she claimed the trial court erred in not granting her motion for a new trial or a verdict of acquittal after trial. The Court of Appeals was not convinced by these claims and affirmed.

This Court granted discretionary review to decide whether Allen was properly convicted of theft by deception and whether she was entitled to introduce specific evidence of Weaver's convictions.

## II. Analysis

Allen has pursued the same three issues on discretionary review to this Court. Because the directed verdict issue, if decided in Allen's favor, would render the other issues moot, it must be addressed first.

### A. Allen was not entitled to a directed verdict on the theft charge.

On appeal, a claim of entitlement to a directed verdict is evaluated under the long-standing standard of *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991). Under that case, the evidence must be viewed in the light most favorable to the Commonwealth, with the Commonwealth's proof assumed true and questions of credibility and weight left to the jury. *Id.* at 187. When the case is on appeal, the defendant must show that "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* "[O]nly then the defendant is entitled to a directed verdict of acquittal." *Id.*

Allen claims to have satisfied this standard with respect to her theft conviction.[5] Specifically, she claims that she was entitled to a directed verdict because she obtained no property or services, an essential element of theft by deception. As a secondary argument, assuming the Commonwealth did prove that she obtained property or services, she claims that Toyota never relied on her allegedly false representation, which our cases require. We address each claim in turn.

*1. The Commonwealth sufficiently proved that Allen obtained "property," and thus the trial court properly denied the directed-verdict motion.*

Allen argues that she obtained no property or services because no one ever tried to collect the debt from her; there was no

---

4. The jury instructions ultimately described the victim of the theft as the Toyota Motor Credit Corporation. After all the proof, the Commonwealth made an oral motion to amend the indictment to conform to the proof, which showed that Toyota Motor Credit, not Oxmoor Toyota, was the victim. This motion was granted.

5. Allen does not claim that she was entitled to a directed verdict on the perjury conviction, which depended on part of her overall deception, namely, falsely swearing and signing the criminal complaint for identity theft against Weaver.

evidence that the debt against her ever existed; and there was no "pecuniary significance" to the discharge of the debt because it was still collectable against Weaver, as the primary obligor, and against Allen, assuming the debt against her could be reestablished. She notes that she never "received or possessed the truck," that she never "obtained any property, money or services as a result of her alleged deception," and that she "received no such benefits, and never so much as drove Curtis Weaver's truck."

■ Before turning to what the proof at trial showed, it is necessary to first establish exactly what the law requires for a conviction of theft by deception. Theft by deception is defined in KRS 514.040. The essential elements of the offense require that "the person obtain[ ] property or services of another by deception with intent to deprive the person thereof." KRS 514.040(1). Because Allen has not challenged whether she deceived Toyota,[6] the central question in this case is whether she obtained "property." [7]

The arguments in the brief and at oral argument focused on the common understanding of property, i.e., that the word includes only things like money or physical property. But "property" is a statutorily defined term. Under KRS 514.010(6), " 'Property' means anything of value, including real estate, tangible and intangible personal property, contract rights, documents, choses-in-action and other interests in or claims to wealth, admission or transportation tickets, captured or domestic animals, food and drink." This definition has not been cited in any of the briefs submitted to this court, nor was it mentioned at oral argument.

■ Yet it is illuminating, since it shows that the legislature intended the theft statute to cover a broader range of "property" than the ordinary meaning by itself might suggest. Indeed, the commentary notes that "[t]he definition of 'property' is indicative of the *all-inclusive scope* of theft offenses under the Code." KRS 514.010 Kentucky Crime Comm'n/LRC Cmt. (1974) (emphasis added).[8] Thus, it is clear that

---

6. In fact, she goes so far as to say: "Viewed in the light most favorable to the Commonwealth, Allen may have 'deceived' within the meaning of the statute." Deception under the statute can occur in several ways, including "when the person intentionally ... [c]reates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind; [or] ... [p]revents another from acquiring information which would affect judgment of a transaction...." KRS 514.040(1)(a)–(b). Assuming the Commonwealth's proof that she lied when she claimed Weaver forged her signature is true, then this element was proved sufficiently to avoid a directed verdict.

Moreover, proof in the record indicates that Allen did engage in deception and lied about Weaver forging her signature. Not only did two witnesses testify to seeing her sign the documents, her story when interviewed by police changed repeatedly. She initially claimed that she never set foot on Oxmoor Toyota's property, but later in the same inter-

view admitted to going there with Weaver on one occasion. She also denied signing any documents for Weaver, but just a few minutes later admitted to signing some type of document. She claimed this document was only so that a credit check could be run but still denied "signing any paper for him to get a vehicle." The jury could conclude from the testimony and her own shifting story to the police that she signed the paperwork and that she lied.

7. There is no real question that the proof did not show that Allen obtained "services." Allen's brief states repeatedly that she did not. The Commonwealth does not dispute this.

8. The Commentary goes on to note: "Security interests are not subject to theft offenses under this chapter. Generally, offenses involving security interests such as concealment or transfer of assets and defrauding creditors are covered by KRS Ch. 517, Business and Commercial Frauds." KRS 514.010 Kentucky

the definition of property in the statute is very expansive, covering *anything of value*, and includes intangible property and contract rights. Thus, the fact that Allen did not receive tangible property, like the truck itself or money, does not mean she did not commit theft by deception.

Assuming the Commonwealth proved that Allen actually signed the loan documents and thus entered into an agreement with Toyota, of which there is ample proof,[9] and that Allen later deceived Toyota into discharging the debt against her, it seems clear under this expansive understanding of "property" that Allen indeed obtained *property* of some sort from Toyota. Before the deception and resulting discharge of debt, Toyota had certain contractual rights enforceable against Allen. Chief among these was the right to have the amount of the debt and any accrued interest paid to it by Allen. Contractual rights are things of value—they are property rights—and, indeed, are specifically named in the statute. Because of Allen's deception, Toyota gave up that contractual right. So the answer to the question of what was stolen is that Allen stole Toyota's contractual right to collect on the debt.

This leads to the question whether Allen "obtained" the property in question, the contractual right. "Obtain," as it relates to theft, is also a statutorily defined term; it means, "[i]n relation to property, to bring about a transfer or purported transfer from another person of a legal interest in the property, whether to the obtainer or another." KRS 514.010(4)(a). While Allen undoubtedly deprived Toyota of property, she argues she *obtained* nothing, since the discharge simply deleted the debt and thus extinguished the contractual right, which was not literally transferred to Allen. When she caused Toyota to write off her loan, she did not receive intangible property, like a promissory note or commercial paper, which was assigned to her and which gave her contractual rights that she could enforce against another person. But Toyota's contractual right to receive payment on the debt was effectively transferred to Allen. The contractual right to be paid on the debt was an asset to Toyota, and the resulting contractual obligation to pay was a liability for Allen. Placed on a balance sheet for Toyota and a balance sheet for Allen, the contractual right and corresponding obligation would be the only asset and liability present. On Toyota's

Crime Comm'n/LRC Cmt. (1974). Arguably, defrauding a creditor is exactly what Allen did, but her offense does not really fit within KRS Chapter 517, which criminalizes things like deceptive business practices, KRS 517.020, false advertising, KRS 517.030, and bait-and-switch advertising, KRS 517.040.

9. Both Curtis Weaver and the car salesman, Ralph Dawkins, testified that Allen went to the dealership and signed the loan documents. While Allen challenged the credibility of both witnesses—Weaver's testimony was self-interested, and he is a convicted felon; Dawkins's wife is Weaver's cousin—their testimony must be assumed true when deciding a directed verdict question. Their testimony was buttressed by the documents admitted into evidence that showed that Allen's purportedly forged signature on the loan documents was very similar to that on documents she admitted to signing, though they differed in that the loan documents included her middle initial and the other documents did not. Some of the handwriting on one of the credit applications appears to be very similar to Allen's handwriting on both her affidavit of identity theft submitted to Toyota Motor Credit Corporation and the criminal complaint intake form. The jury could properly compare the handwriting. *See* KRE 907(b)(3) (allowing authentication or identification of a writing by "[c]omparison by the trier of fact ... with specimens which have been authenticated"); *see also Commonwealth ex rel. Eversole v. West*, 265 Ky. 550, 97 S.W.2d 405, 406 (1936) (allowing the jury to make comparisons of signatures).

balance sheet, the asset would show a positive balance of $7,487.84. On Allen's balance sheet, the liability would show a negative balance of $7,487.84.

As a result of Allen's deception, Toyota discharged the debt, effectively deleting it from its balance sheet. By doing so, Toyota gave up an asset, moving from a positive balance to a zero balance for a net loss. On the other hand, Allen was relieved of a liability, moving her negative balance also to a zero balance for *a net gain*. Thus, Toyota suffered a loss, and Allen enjoyed a gain, all in the course of a zero sum transaction. There can be no question that relief from the debt was personally valuable to Allen.

The contractual right to collect on the debt is unquestionably *a thing of value*. Toyota could have sold the debt to another entity, a common practice in many industries, or sought to enforce the agreement itself. Toyota's right to be paid on the debt became Allen's freedom not to pay the debt. But unlike legitimate contractual agreements that are entered into voluntarily, Allen caused the transfer through fraud.

At first blush, it appears that Toyota voluntarily gave up its right to collect on the debt, and thereby evinced a belief that the debt was not a thing of value because it was invalid. But a voluntary transfer, because of deceit, is what happens in every instance of fraud, in every con game or scam or grift. By means of the deceit, sometimes by convincing the victim that the property has no value, the fraudster induces the victim to give over property *voluntarily*.

Yet such voluntary transfers are criminalized, specifically as theft by deception under KRS 514.040. Inducing a voluntary transfer is the essence of fraud and is what differentiates it from simple theft. Thus, in *Elliott v. Commonwealth*, 75 Ky. 176,

179 (1876), the court noted that obtaining the "right to property," as opposed to "possession only," by "trick or artifice" is the distinction between obtaining goods by false pretenses, the precursor to the modern theft by deception, and larceny, the precursor to the modern theft by unlawful taking.

A swindle is no less a swindle because the mark thinks he got a good deal. Otherwise, the law rewards a con man for being a better con man than the next guy.

At oral argument, the Commonwealth was asked whether Allen still owed the debt and, if so, whether she obtained any property since she still had the obligation. In responding to the questions, the Commonwealth admitted that because Allen had actually signed the loan documents, she still technically owed the debt. But while this might be true in some metaphysical or moral sense, it was not true in a legal sense after the debt was discharged. At the time of trial, Toyota had given up its right to collect the debt from Allen. Thus, at that time, she was under no legal obligation to pay the debt. At best, Toyota could institute a legal action or enter into negotiations to make Allen liable. But absent Toyota taking those steps and obtaining a court judgment or agreement, Allen had no legal obligation to pay the debt.

■ A related question is whether the fact that Allen might possibly be made liable on the debt, either civilly or as restitution, in the future is a possible ground for why she did not obtain any property. Her potential liability on the debt in the future, however, does not change whether she committed a crime in the past. From the time of the discharge until at least the end of trial, Toyota had been deprived of its right to enforce the debt against Allen. Thus, while Allen was legally obligated to

pay the debt in the past and could be legally obligated in the future to pay the debt, she was at least temporarily, by her own fraud, relieved of that obligation after the discharge.

■ The requirement that the property be "obtained" does not mean that the victim is permanently deprived of the property. A temporary deprivation is enough. The simple theft statute, KRS 514.030, which criminalizes the taking of or exercising of control over another's property, illustrates that the victim can get the property back, either through restitution or a civil suit, yet this does not mean the defendant was innocent of theft. Indeed, a person can be guilty of theft "even though the [person] unequivocally intends to return the property," if the person "withhold[s] [the] property for so extended a period as to appropriate a major portion of its economic value." KRS 514.010 Kentucky Crime Comm'n/LRC Cmt. (1974).

By analogy, under the theft-by-deception statute, so long as the defendant deprives the owner of the property, even if only for a period of time, by deceptive means, the defendant has committed theft by deception. It does not matter whether the victim could get the property back by a civil conversion action or that the defendant had a change of heart and returned the property. Otherwise, the civil justice system would supplant the criminal law of theft by deception, and any thief could avoid a charge by simply returning the stolen property. Such remedial action does not undo the theft, nor does the possibility of such remedial action.

Finally, Allen suggests that Toyota was not deprived of any property because Weaver was still an obligor on the debt,

meaning Toyota could recover from him. This claim does not require a directed verdict.

First, it is not clear from the record whether Weaver was still responsible for the debt. At trial, Shannon Hamblin, the representative from Toyota Financial Services, testified about how Allen obtained the discharge of her debt. When asked on cross-examination whether Weaver still owed the debt, since he also signed on the loan, she testified that she assumed his debt had also been discharged, even though she did not have his file or information and he had filed no identity-theft claim. When pressed on this question, she admitted that she did not know whether the debt had been discharged against Weaver, but she noted that according to her documents the debt had been "charged off," which is done when the company takes a loss on the debt.

■ More importantly, however, even if Weaver were still obligated to pay, Allen's deception still deprived Toyota of a thing of value, namely, the right to proceed against *her* for the debt. Clearly, that right was valuable to Toyota, since Weaver's credit was bad enough to require a cosigner in the first place. Allen had a steady, respected job and, apparently, good credit, and it was her signature on the loan that made it worth issuing in the first place.[10] With only Weaver remaining on the loan, Toyota was left with a substantially devalued asset, one it would not have taken on in the first place without Allen because of the increased risk associated with it. That devaluation was caused directly by Allen's deception.

This Court concludes that based on the proof at trial, when viewed as a whole and

---

**10.** It was Allen's guaranty of the loan that likely dictated its terms, such as a possible lower interest rate and lower monthly pay-

ments than if Weaver had somehow obtained the loan himself from another source.

in the light most favorable to the Commonwealth, it would not have been clearly unreasonable for the jury to find guilt. Thus, Allen was not entitled to a directed verdict on this issue.

*2. Toyota's partial reliance on its own internal investigation did not entitle Allen to a directed verdict.*

■ Allen also argues that she did not commit theft by means of deception because Toyota discharged the debt based on its own internal investigation, not any claim that she made. This Court has held that reliance by the victim on the thief's deception or false impression is "a necessary element under KRS 514.040." *Brown v. Commonwealth*, 656 S.W.2d 727, 728 (Ky.1983); *Commonwealth v. Burnette*, 875 S.W.2d 865, 868 (Ky.1994).

Allen's claim that Toyota relied only on its own investigation, however, is belied by the testimony at trial. Shannon Hamblin, the Toyota Financial Services representative, did testify that Toyota investigated Allen's claim of identity charges and discharged the debt because it concluded that the signature on the loan documents did not match Allen's and that Allen had never lived at the address listed on the loan documents. However, when pressed on cross-examination to state that the discharge was only the result of the in-house fraud investigation, Hamblin stated that the identity-theft affidavit filed by Allen was also "absolutely" part of the reason for the discharge. This makes sense, of course, since Toyota never would have looked into the account but for Allen's claim of identity theft. Her claim, which some proof showed was false, set the entire course of events in motion. Thus, even if Toyota relied in part on its own investigation, it necessarily also relied on Allen's false statements. From this, the jury could have reasonably believed that Toyota relied on Allen's deception. Thus, Allen was not entitled to a directed verdict on this issue.

**B. Allen was entitled to inquire into the conduct underlying Weaver's convictions on cross-examination under KRE 608(b).**

During cross-examination of Weaver, Allen's counsel sought to inquire about the specific conduct that led to Weaver's prior convictions. Specifically, he wanted to ask about conduct underlying convictions related to an incident in which Weaver was found with counterfeit money in his car and gave a false name to the arresting officer twice. Because of this incident, Weaver was charged with and in 2002 pleaded guilty to 25 felony counts of first-degree criminal possession of a forged instrument (KRS 516.050), and two misdemeanor counts of giving a false name to a peace officer (KRS 523.110).[11] He was sentenced to five years' imprisonment, which was probated.

■ Allen claims that proof of this conduct was admissible as impeaching character evidence. She specifically argues that she should at least have been allowed to ask about Weaver's criminal acts on cross-examination under KRE 608(b). She also argues in the alternative that if the Rules of Evidence do not allow this inquiry, then her constitutional due process right to present a defense should trump the rule. Given the preference for

---

11. Weaver also pleaded guilty to first-degree trafficking in a controlled substance at that time. Allen's counsel did not appear as concerned about exploring this charge, though he did ask about it on avowal. On avowal, Allen's counsel also asked Weaver about several charges that did not result in convictions (including terroristic threatening and harassing a witness), and other misdemeanor convictions stemming from charges of wanton endangerment and menacing.

resolving cases on statutory or other non-constitutional grounds when possible,[12] this Court addresses Allen's claim about KRE 608(b) first.

Allen notes in her brief that her "trial counsel sought merely to cross-examine Weaver about the nature of the prior acts for which he was convicted, because such acts were highly probative of his character for truthfulness." However, during the avowal, Allen's trial counsel confronted Weaver with copies of his various convictions and read parts of them out loud, though these documents were not added to the record for appeal.

Generally speaking, reputation evidence is admitted in the form of opinion or general reputation. *See* KRE 608(a). Indeed, before 2003, such evidence could "refer *only* to general reputation in the community." KRE 608 (1992) (emphasis added). And ordinarily, a person's other crimes or bad acts, other than those that the trial is about, are inadmissible, with some limited exception. *See* KRE 404(b).

But in 2003, KRE 608 was substantially amended to track the federal version of the rule. *See* Supreme Court Order 2003–3 (April 23, 2003). Now, under KRE 608(b), specific instances of bad conduct reflecting on the witness's dishonesty may be inquired about. The rule provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the

discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness: (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. No specific instance of conduct of a witness may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of his inquiry.

KRE 608(b). Of particular importance, the rule does not allow proof of specific instances of conduct by extrinsic evidence. Instead, counsel is limited to asking the witness about the specific instance of conduct on cross-examination and is stuck with whatever answer is given. KRE 608(b) distinguishes general instances of behavior from convictions, which it states can be proven only under KRE 609, which does allow proof by extrinsic evidence in the event the witness denies a bona fide conviction, and which deals only with felony convictions.

In 2010, this Court held that KRE 608 did not apply to conduct that had resulted in a criminal conviction, which instead is covered by KRE 609. *See Childers v. Commonwealth*, 332 S.W.3d 64 (Ky.2010). This Court stated: "KRE 608(b) permits impeachment only by specific instances of conduct that have not resulted in a conviction while evidence relating to impeachment by criminal conviction is governed

---

**12.** The constitutional question need not—and indeed cannot—be resolved in this case if it can be decided on another ground. *See Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such

adjudication is unavoidable."); *Louisville/Jefferson County Metro Gov't v. TDC Group, LLC*, 283 S.W.3d 657, 660 (Ky.2009) (applying " 'the long-standing practice of this Court ... to refrain from reaching constitutional issues when other, non-constitutional grounds can be relied upon.' ") (quoting *Baker v. Fletcher*, 204 S.W.3d 589, 597–98 (Ky.2006)).

solely by KRE 609." *Id.* at 69; *see also id.* at 72 ("[W]e hold that KRE 608 permits impeachment only by specific acts that have not resulted in a criminal conviction. Evidence relating to impeachment by criminal conviction is governed solely by KRE 609.").

In so holding, this Court rejected the exact proposition that Allen now urges, and instead adopted the federal approach as to which subjects are covered by KRE 608 and 609. *Id.* at 69–70. Thus, under *Childers,* where the acts in question result in a criminal conviction, they are admissible for character purposes only when KRE 609 allows it. *Id.*

Under *Childers,* the acts Allen sought to ask about resulted in convictions and thus are covered only by KRE 609, which only allows inquiry into whether the witness is a convicted felon. If the witness admits the felony conviction, then that is the end of the inquiry; if the witness denies the conviction, then extrinsic proof of the conviction may be admitted. Unlike the federal rule, KRE 609 does not allow proof that the witness was convicted of a non-felony (usually a misdemeanor) involving dishonesty or reflecting on character for dishonesty.

But the inability to inquire in any way about misdemeanor convictions reflecting on dishonesty illustrates a substantial hole in the present KRE 608–609 regime. Though it was not necessary to the holding, *Childers* sought to fill that hole by stating in a footnote that "under Rule 609, evidence of a misdemeanor conviction can never be admitted." 332 S.W.3d at 71 n. 2. Allen urges that this rule should not apply to Weaver's misdemeanor convictions, in part because *Childers* was concerned only with felony convictions, if we are not inclined to overrule. Allen's claim is driven by the assumption that evidence of criminal dishonesty *should* be admissible, even

(and perhaps especially) when it results in a conviction.

This Court agrees that such a result seems to be simply unfair. *Childers* allows the absurd result that misdemeanor-level dishonest conduct is admissible under KRE 608(b) if a person were simply lucky enough not to have been convicted (whether because the crime was never charged or the charge was dismissed), but that a person who has actually been convicted of a misdemeanor involving a crime of dishonesty could avoid impeachment.

This, then, requires a closer examination of *Childers* and its reading of the interplay between KRE 608 and 609. In choosing to reexamine Childers, we are mindful of the constraints of *stare decisis* and the call that changes to the law of evidence "should occur only after a judicious Darwinian process." *Fisher v. Duckworth,* 738 S.W.2d 810, 813 (Ky.1987). But it is worth noting that *Childers* was decided by a divided Court. And while the author of this decision joined the majority in that case, we are also mindful that "the doctrine of stare decisis does not commit us to the sanctification of ancient or relatively recent fallacy." *Matheney v. Commonwealth,* 191 S.W.3d 599, 604 (Ky.2006) (quoting *Morrow v. Commonwealth,* 77 S.W.3d 558, 559 (Ky.2002)). As we noted in *Morrow,* "respect for precedent demands proper reconsideration when we find sound legal reasons to question the correctness of our prior analysis." 77 S.W.3d at 559.

The question, then, is whether we agree that the analysis in *Childers* was correct. After substantial reflection, we conclude that it was not completely so.

Nothing in the language of KRE 608 suggests that so long as a proponent does not attempt to prove the conduct involved in a misdemeanor conviction by

extrinsic evidence, simple inquiry about that conduct should be unacceptable. KRE 608(b) says nothing about barring "inquiries" into specific behavior, and actually expressly allows them on cross-examination if the behavior reflects on the witness's character for truthfulness. Instead, the rule only says that such conduct may not be proved by *extrinsic* evidence, except as allowed under KRE 609.

We held in *Childers* that this exception to the extrinsic-evidence limit meant that evidence of conduct resulting in a conviction could only be admissible—if at all—under KRE 609. Of course, KRE 609 only allows evidence of felonies, not misdemeanors, and even then only when the witness denies the conviction. We adopted this approach because it follows the model of the federal rules, which our current KRE 608 tracks.

Our KRE 609 differs substantially from its federal counterpart, however, which allows proof of misdemeanor convictions reflecting dishonesty and does not require a denial by the witness before extrinsic evidence of the conviction is admissible. We avoided this discrepancy in *Childers* by stating that our rules "are significantly similar to their federal counterparts" and that "the discrepancies which exist do not affect our analysis here" because "the thrust of the rules, especially as it concerns this issue, is the same." *Childers*, 332 S.W.3d at 81 n. 1. This was accurate in regard to *convictions*, but not as to *conduct*.

This case illustrates that the federal scheme differs substantially from our rules. The federal 608 and 609 offer a complete system for addressing specific conduct reflecting on dishonesty in a manner that avoids collateral matters while also allowing inquiry into a subject that is very probative of a witness's truthfulness or dishonesty.

Federal Rule 609 allows extrinsic evidence of *any* criminal conviction where "establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed.R.Evid. 609. Extrinsic proof of the conviction is allowed because it is the conclusive proof that the witness committed the dishonest act or said the false statement. It works as a sort of collateral estoppel on the issue of the witness's dishonesty.

Federal Rule 608, like KRE 608, allows *inquiry* on cross-examination about specific instances of dishonest conduct. It avoids getting into collateral matters by not allowing impeachment by extrinsic evidence after the witness answers. Under this scheme, it makes sense to completely divide conduct that led to a conviction and conduct that did not, because it takes into account the whole of dishonest conduct.

But, as the federal advisory committee noted, "[e]ffective cross-examination demands that some allowance be made for going into matters of this kind." Fed. R.Evid. 608 Adv. Comm. Notes to Proposed Rules (1972). The only concern is avoiding the substantial possibilities of abuse presented by such collateral matters, which the limits on use of extrinsic evidence are intended to accomplish. *Id.* But when this Court bars any evidence of misdemeanor conduct that led to a conviction—even when it conclusively proves dishonest conduct—the ability to effectively cross-examine a witness is undermined.

And, it should be noted that this case has both prior felonies and misdemeanors that reflect dishonesty. The misdemeanors—giving a false name to a police officer—are arguably even more convincing than the felony crimes of possession of forged instruments.

Unlike the federal rules, KRE 608 and 609 do not offer a complete system for addressing dishonest conduct and what it says about a witness's character for truthfulness. Indeed, based on the language in the rules, only 608 is aimed at *conduct* directly reflecting on truthfulness, but bars extrinsic proof of that conduct (such as by proof of *convictions* except as dealt with by KRE 609). KRE 609, on the other hand, is concerned with the fact of *any* felony conviction, which only indirectly illustrates character for dishonesty if at all.[13] Thus, unlike the federal rules, the Kentucky rules have a hole in them, as noted above. Our attempt in *Childers* to fill this hole by adopting the federal treatment of convicted and non-convicted behavior—that is, treating them as falling under mutually exclusive rules—serves only to undermine the ability to cross-examine.

Part of the problem is that it is tempting to conflate the conduct reflecting on dishonesty with a conviction for that conduct. But a conviction is not conduct, at least not by the witness who engaged in the conduct. Rather, the conviction is proof of the conduct, which in turn reflects on the person's character for truthfulness. The conviction is allowed in some cases because it is the best proof that the person actually engaged in the dishonest conduct, such as when a felon denies he was convicted under KRE 609.

But the ultimate fact to be proved when dishonesty is the issue is the person's character, which is shown directly by the conduct, which, in turn, is shown indirectly by the conviction. It is a chain of proof, which is allowed because it is relevant, probative, and avoids collateral matter, since the conviction cannot be challenged.

There is no reason, however, that the dishonest conduct that led to the conviction should not also be admissible in some form. Indeed, the conduct itself is closer in the chain of proof to the ultimate fact (the person's dishonest character) than the conviction. As noted above, the only concern with proving dishonest conduct by means other than a conviction is the danger of over-collateralizing matters, not because the conduct is irrelevant or not probative.

Courts rightfully avoid what amounts to a mini-trial within the trial about whether the person actually committed the dishonest act by carefully scrutinizing collateral evidence, a decision that is well within a trial court's experience and purview. Rule 608 recognizes the trial court's exercise of discretion, and substantially limits the inquiry with two safeguards: (1) no extrinsic evidence is allowed, and (2) the inquiry is limited to asking the witness (inquiry) about the conduct on cross-examination. (The inquiry is further limited to conduct that is "probative of truthfulness or untruthfulness." KRE 608(b).)

Yet, the purpose of KRE 608(b) is to avoid over-collateralizing trials, not to prohibit proper impeachment or effective cross-examination. Thus, the better reading of KRE 608 and 609 would allow some inquiry as to the conduct underlying a criminal conviction, so long as the conduct is probative of truthfulness or untruthful-

---

13. While we have said "the fact of a felony conviction is, in and of itself, powerful evidence that reflects on truthfulness," *Childers v. Commonwealth*, 332 S.W.3d 64, 71 (Ky. 2010), that claim depends on an assumption—that all felons are inherently dishonest. We have respected this view, though it may not be true at all. There is not necessarily an inconsistency in a person who, for example, commits a murder yet always tells the truth. In such a case, the assumption underlying the rule would actually undermine the search for truth in a case.

ness. The only question is the limit on that inquiry.

KRE 608 lays out a substantive limit: the conduct must be probative of truthfulness or untruthfulness. As long as the conduct in question is so probative, whether it resulted in a criminal conviction or not, the court may, in its discretion, allow inquiry into it but not extrinsic proof of the conviction itself. KRE 608 also lays out two procedural safeguards: the conduct cannot be proved with extrinsic evidence, and may only be inquired into on cross-examination.

This could suggest a conflict between the intent of KRE 608 and 609. For example, a defendant could ask a witness like the one in this case whether he had been convicted of a felony under KRE 609, to which he says "yes," with the very next question being about the conduct involved in that felony under KRE 608 (for example, possession of counterfeit money). This would lead to the inference that the felony conviction was for possession of counterfeit money, thereby impliedly disclosing that the witness has been convicted of that offense in violation of KRE 609.

While this use of the rules shows how KRE 608 could be used to inquire into a subject that may not be inquired into under KRE 609, this does not mean that the inquiry is forbidden or unfair. The simple fact is that KRE 608 allows inquiry on cross-examination as to bad acts—with the limit being that the questioner is stuck with the answer, whatever it is. That such an inquiry may follow on the heels of a KRE 609 inquiry into whether the witness has a felony conviction, thereby leading the jury to believe that the bad act asked about was the basis for the felony conviction, is not barred by the rules. If this could mislead the jury—for example, if the bad act asked about under KRE 608 was not the basis for the conviction asked

about under KRE 609—then a well-timed objection will allow the trial court to exercise its discretion to require handling the evidence in a fair and truthful manner.

On the other hand, if the witness denied the conviction when asked about it under KRE 609, and the defendant offered extrinsic proof of it, then KRE 608's proscription on extrinsic proof would appear to be violated. But this concern is illusory, since KRE 608 specifically excepts proof of a conviction under KRE 609, which in turn allows proof of a felony conviction with extrinsic evidence, if the witness denies the conviction's existence.

Ultimately, the scope of any inquiry under KRE 608 and 609 remains within the trial court's discretion, subject of course to limits imposed by other rules, such as KRE 403. The trial court is always empowered to prevent misuse of these rules when necessary, possibly by separating the inquiries, clearly showing what is being asked about, or, if necessary, instructing the jury how it may consider the evidence. This is not an uncommon task for trial courts and counsel.

The final question is how this applies to Allen's case. Allen was able to introduce the fact that Weaver had been convicted of a felony (the 25 counts of possession of a forged instrument). However, she was not allowed the choice to instead ask about the conduct that led to those convictions.

More importantly, Weaver's other convictions at issue in this case were misdemeanors (two counts of giving a false name to police), and *no* proof of those was allowed. The *conduct* underlying those convictions tends to show that he had previous acts of deception—direct lies to police. That conduct was subject to inquiry under KRE 608(b), though not to proof by extrinsic evidence; the fact of the misdemeanor convictions themselves was not ad-

missible under either KRE 608 or 609. While Allen could not ask about or otherwise show that this conduct led to a conviction, she should have been permitted to ask Weaver if he had previously lied to police.[14]

 This error, however, does not automatically require reversal. Like all evidentiary errors, it is subject to the harmless error rule, RCr 9.24. The test for harmlessness is whether the error substantially swayed the verdict. *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (quoting *Kotteakos v. United States, 328 U.S. 750,* 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (alteration in original). We cannot say that the error in this case did not have a substantial influence on the verdict and, at the very least, we are left in grave doubt.

Allen's primary defense was that Weaver forged her signature on the loan documents and lied about her involvement. The proof Allen sought to introduce went to the core of her defense and would have impeached the character and credibility of the Commonwealth's star witness. While Weaver's testimony was buttressed by the testimony of another witness, Ralph Dawkins, that witness was Weaver's cousin by marriage and thus was arguably biased. In addition, if Dawkins had not agreed with Weaver, his testimony would tend to make him a party to the deception and potentially criminally responsible. Weaver's prior dishonest, criminal acts are directly relevant to his character for truthfulness or untruthfulness.

Toyota, in its internal investigation, exonerated Allen. Allen never exercised any control over the vehicle, and Weaver made all the payments. This investigation was begun because of a quarrel between Weaver and Allen, and escalated into a criminal investigation of an entirely different matter. It is clearly not unduly speculative that Weaver found himself between a rock and a hard place when the criminal charges came down: admit he forged Allen's name on the loan papers or blame her.

 Given that Weaver's testimony coupled with his relative's support was the only definitive evidence in the case, his credibility—or the lack thereof—was the only defense Allen had. And the lack of the evidence no doubt had an effect on the jury; or conversely, its presence likely would have made a substantially different case. The jury ultimately had to decide a close case. As such, it cannot be said that disallowing the proof as to Weaver's prior dishonest conduct was harmless.[15]

---

14. KRE 608(b) gives the trial court discretion whether to admit such evidence, and thus it is never automatically admissible. In this case, however, the court applied a categorical legal bar on proof of the misdemeanor conduct, meaning no discretion was involved. More importantly, a proper exercise of discretion would have allowed the proof, since it went to the heart of Allen's defense, which was that Weaver lied and actually forged her signature.

15. Because the case is decided under the evidence rules, the due process claim need not be addressed fully. To the extent that Allen argues that her right to due process requires admission of more evidence than this decision would allow, it suffices to say that she is entitled only to *due* process, not perfect process, and this resolution of this case fairly balances all the equities of the case while leaving the precise language of KRE 608 and 609 intact as written, without resorting to inferences. While "[l]imitations on cross-examination, including cross-examination to expose bias or prejudice, involve a fundamental constitutional right and should be cautiously

## C. Allen was not entitled to use evidence of Weaver's prior bad acts substantively under KRE 404(b).

Allen also claims she was entitled to admit evidence of Weaver's prior crimes under KRE 404(b). She also claims she was entitled to show his probationary status under the rule, and that evidence of his prior bad acts was necessary to properly cross-examine the investigating officer, Sergeant Marthet.

Before turning to the merits this claim, a preliminary matter must be addressed. Since Allen's convictions are reversed for other reasons, some aspects of this claim should be only addressed because the issue it raises is likely to recur if she is retried. *Terry v. Commonwealth*, 153 S.W.3d 794, 797 (Ky.2005). Additionally, the decision above allowing a criminal defendant in some circumstances to inquire about specific acts reflecting on truthfulness and for which the witness was convicted of a criminal act does not completely render this claim moot. The type of evidence covered by the decision above is pure character evidence, offered solely to assail the credibility of the witness. Such evidence has a limited use. Evidence of other crimes or bad acts offered for other purposes, as under KRE 404(b), "is called character for

substantive use." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 4.20[2], at 299 n. 1 (4th ed.2003). Such evidence may be used differently and has fewer limitations on how it may be introduced than pure character evidence. Moreover, KRE 404(b) can be an alternative route for admitting evidence that is not admissible under other rules like KRE 608. *See Blair v. Commonwealth*, 144 S.W.3d 801, 810 (Ky.2004).

*1. Weaver's prior convictions were not similar enough to show* modus operandi.

The essence of Allen's claim is that evidence of Weaver's prior convictions was admissible as substantive evidence under KRE 404(b).[16] That rule reiterates the prohibition on using evidence of other crimes or bad acts "to prove the character of a person in order to show action in conformity therewith." KRE 404(b). But it also includes an exception for use of such evidence "offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1).[17] Though not listed in the rule, bad acts are frequently admissible to show a person's *modus operandi*. *See, e.g., Dickerson v. Commonwealth*, 174 S.W.3d 451, 468 (Ky.2005).

applied," *Caudill v. Commonwealth*, 120 S.W.3d 635, 661 (Ky.2003) (citations omitted), it is also true that " '[s]o long as a reasonably complete picture of the witness'[s] veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries.' " *Id.* (quoting *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky.1997)). This decisions' interpretation of KRE 608 and 609 allows such a reasonably complete picture of the witness's bias and veracity to satisfy the requirements of due process.

16. Allen claims, in a very short part of her brief, that the trial court erred by making conclusory rulings with respect to KRE 404(b) and not discussing the KRE 404(b)

"test" on the record. While a court must consider several factors—relevance (i.e., the other purpose), probativeness, and prejudice—nothing requires such consideration to be explicitly detailed on the record. Such a requirement would slow many trials to a crawl and is simply unnecessary. The trial court did not err in this respect.

17. The rule also allows evidence that is "so inextricably intertwined with other evidence essential to the case that separation of the two ... could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). That exception, however, is not at issue in this case.

■ Allen claims that Weaver's convictions for possession of forged instruments and lying to police in the past show a *modus operandi* that was relevant because she claimed in her defense that Weaver had forged her signature and lied to police to start the charges against her. Her theory is that his prior possession of forged documents shows a *modus operandi* that, in turn, shows that he forged her signature, and that his prior lies to police show a second *modus operandi* that, in turn, shows that he lied to the officers when he filed his complaint against her. However, this Court concludes that the offered proof was insufficient to show *modus operandi* and thus was inadmissible under KRE 404(b).

■ As Allen notes, when a criminal defendant seeks to prove a witness's prior bad acts, so-called reverse 404(b) evidence, the standards that ordinarily require exclusion are relaxed. Frequently, 404(b) questions, especially when *modus operandi* is invoked, turn on the similarity between the prior bad act and the newly alleged one. This Court has noted that "a lower standard of similarity should govern 'reverse 404(b)' evidence because prejudice to the defendant is not a factor." *Blair v. Commonwealth*, 144 S.W.3d 801, 810 (Ky. 2004) (quoting *United States v. Stevens*, 935 F.2d 1380, 1404 (3rd Cir.1991)). Thus, a defendant can frequently admit evidence defensively that "would not satisfy the high standard of admissibility established for KRE 404(b) evidence offered against an accused." *Id.*

The question as to the possession-of-forged-instruments convictions, then, is whether they are similar enough under this looser standard to the forgery that Allen alleges Weaver committed against her. Allen suggests that the forgery charges are similar enough to the new alleged forgery to be admissible to show

that Weaver actually forged her signature in this case. This, she claims, would support her defense that she did not commit fraud or any deception when she claimed Weaver stole her identity. This Court concludes the crimes are not similar enough for the prior crimes to be admitted for substantive use under KRE 404(b).

In *Blair*, the prior bad act was a theft of a VCR from the evidence room. *Id.* Though the officer in question did not steal the VCR, he allowed his supervisor to do so and was thus charged with official misconduct, which led to his discharge from the police force. The newly alleged act was theft of money from a crime scene. *Id.* The defendant was accused of stealing the money (to show an aggravating factor for a capital crime), but he claimed that the police officer took it. This Court concluded that the thefts were sufficiently similar that the defendant could introduce the earlier theft because they were both thefts, the Commonwealth raised the issue about the missing money (to prove the existence of an aggravating factor), the officers were the only people with access to the scene other than the defendant, and the officer with the earlier charge was the one who collected the purse from which the money was missing.

Allen's case, however, differs substantially from *Blair*. While the name of the crime—possession of a forged instrument—sounds similar enough, the theory falls apart when the crime Walker actually committed is examined. First, he was not convicted of forgery, but possession of a forged instrument, whereas here Allen claims he actually forged her name. Yet the criminal law distinguishes between committing forgery, *see* KRS 516.020–.040, and possessing the product of a forgery, *see* KRS 516.050–.070. Second, he had in his possession counterfeit money, not a forged loan document. Forging United

States currency is very different from forging a signature on a loan document. Third, the additional factors present in *Blair*—such as the Commonwealth raising the issue first—are not present in this case. Thus, even with *Blair's* lesser standard of similarity, this offense fails the test and thus is not admissible under 404(b).

This may seem in tension with the decision above allowing use of the forgery charge as evidence of character under KRE 608, but it is not. The distinction is that the evidence would be used for a different purpose here. The decision above would allow use of the forgery convictions as proof of character for truthfulness. Here, Allen seeks to use the convictions to show *modus operandi*, which in turn would show the identity of the person she claims actually signed for the truck (and committed forgery in the process). As just noted, the *modus operandi* rules require a great deal of specificity, whereas when we are concerned only with the issue of a witness's credibility, the proof need only touch directly and substantially on credibility. Unlike *modus operandi*, this can be shown by crimes that are substantially different from what the witness is presently accused of. Indeed, when the prior crime is used solely to show character, there may not even be a current accusation against the witness other than that he is not telling the truth on the witness stand.

 As to the claim that Weaver's prior convictions for lying to police officers were admissible to show that he lied to the officers who investigated Allen, it suffices to say that such a showing is irrelevant. Whether Weaver lied in the course of the investigation was not at the core of Allen's defense. She was more concerned with whether he lied on the stand at trial. But use of his prior bad acts to show that is not a substantive use; that is pure character evidence, which is not controlled by KRE 404(b), but by KRE 608 and 609 (and the decision above). Thus, Allen was not entitled to admit proof of those acts for substantive use under KRE 404(b).

*2. The trial court did not err in excluding questions about Weaver's prior convictions during the cross-examination of the investigating officer.*

Allen also argues that she should have been able to use proof of Weaver's bad acts to effectively cross-examine the investigating officer, Sergeant Marthet. Her trial counsel tried to raise this issue during cross-examination of the officer, but the trial court would not allow it. Allen claims the evidence was relevant to show that Sgt. Marthet's belief of Weaver's version of events was unreasonable. Again, this is more of a form of pure character evidence, not KRE 404(b) evidence, and is thus not admissible under that rule.

*3. There was no error in not allowing a substantive inquiry into Weaver's probationary status.*

Allen also argues that she should have been able to offer evidence that Weaver was a probationer under KRE 404(b). Allen has not shown that this evidence was admissible. Though Allen discusses it as going to credibility, which is not what KRE 404(b) is aimed at, she also claims that it showed Weaver's motive to fabricate charges against her and that he had received a light sentence in the past, which showed he had made deals with law enforcement in the past. The Commonwealth states that Weaver's probation would have been completed when he filed his complaint against Allen. And Weaver denied making any deals with regard to his prior conviction or the identity-theft charge was later dismissed. The theory that Weaver had reason to fabricate charges against Allen was speculative at

best. There was no error with regard to this testimony.

## D. The trial court did not err in denying Allen's motion for a new trial or a judgment of acquittal.

Finally, Allen claims that the trial court should have granted a motion for a new trial because "a reasonable finder of fact could not have found Allen guilty, and the trial error were of such a nature as to warrant a new trial." The decision above holding that Allen was not entitled to a directed verdict resolves her claim of entitlement to an acquittal. Thus, Allen may still be retried. The other vague claim need not be addressed, in part because it references arguments made only in the motion for a new trial and not in the brief, but also because Allen's convictions are being reversed for evidentiary errors, as described above.

## III. Conclusion

Because Allen was entitled to cross-examine Curtis Weaver about his prior convictions involving dishonest acts under KRE 608(b), and the trial court disallowed the inquiry, her convictions are reversed.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCOTT AND VENTERS, JJ., sitting.
CUNNINGHAM, SCOTT AND VENTERS, JJ., concur. MINTON, C.J., concurs in result by separate opinion in which ABRAMSON, J., joins.

MINTON, C.J., Concurring in result only:

I concur with the majority in result only because I disagree with the majority's interpretation of Kentucky Rules of Evidence (KRE) 608(b) and 609. But because

application of KRE 608(b) and 609 to this case violates Allen's due process right to present a defense, I concur in the majority's result—remanding the case for a new trial.

Respectfully, I disagree with that portion of the majority's opinion in effect amending KRE 608 and 609. I would read the rules consistent with this Court's recent opinion in *Childers v. Commonwealth*.[18] KRE 609 exclusively regulates witness impeachment relating to a prior conviction, and KRE 608(b) deals exclusively with impeachment using conduct related to truthfulness that did not lead to a criminal conviction.

While I share the majority's frustration with those rules, they were deliberately chosen; and if they are to be amended, the amendments should be the product of the full rule-amending process. As cumbersome and as time-consuming as that process can be, its allowance for the airing of complexities and divergent points of view is nowhere more necessary than with respect to the rules governing the impeachment of witnesses with criminal convictions and prior bad acts. A brief consideration of how we arrived at our current rules will, I hope, make this clear.

To begin, it is helpful to note that in evidence-rules parlance, Kentucky is what is known as a "mere-fact" state. Under our KRE 609, that is, a witness may be impeached with the "mere fact" of a prior felony conviction, without the felony being identified, without mention of the witness's sentence, and without any evidence of the conduct that gave rise to the conviction. Of the states that have addressed the issue, it appears that a substantial majority permit, in some circumstances at least, this sort of "mere-fact" impeachment.[19]

---

**18.** 332 S.W.3d 64 (Ky.2010).

**19.** *State v. Hill,* 801 N.W.2d 646 (Minn.2011) (collecting cases but noting six states that do

But our rule goes beyond merely permitting such prior-conviction impeachment. With respect to criminal convictions, our rule expressly disallows impeachment in any other manner: "The identity of the crime upon which conviction was based may not be disclosed upon cross-examination unless the witness has denied the existence of the conviction."[20] This strict mere-fact approach is a substantial departure from Federal Rules of Evidence (FRE) 609, which permits the cross-examiner to identify the nature of the underlying crime, the date of the conviction, and the range of punishment.[21] And it places us, apparently, in a small minority of strict mere-fact states.[22] Our rule, indeed, appears to be the only one in the country that expressly disallows any identification of the underlying crime.[23]

Three Kentucky cases provided the principal stepping stones to KRE 609. The first was *Cowan v. Commonwealth*.[24] Writing for our predecessor court in that case, Chief Justice Palmore criticized, as "unnecessary and ... unfair," the then existing practice of impeaching witnesses, including testifying defendants, with any fact reflected in the record of a prior conviction.[25] It was the court's opinion, rather,

> that the original purpose of the impeachment statute (now CR 43.07) in referring

to proof by the record was to provide against instance in which the witness might deny that he had been convicted of felony. When he admits it, there is no reason to prove the record of conviction and, perforce, no reason for such further details as may otherwise have been disclosed by it. Henceforth[,] the rule will be so construed. A witness may be asked if he has been convicted of a felony. If he says "Yes," that must be the end of it, with the usual admonition. If he says "No," refutation by the record will be limited to one previous conviction, again with the admonition.[26]

Four years later, the court returned to the issue of witness impeachment and, while acknowledging the concerns about undue prejudice expressed in *Cowan*, opined nevertheless that "it is proper to impeach a witness, even one who may be an accused defendant who chooses to be a witness for himself, by proof of background facts which bear directly on whether jurors ought to believe him rather than other and conflicting witnesses."[27] Accordingly, the court "modified" (a polite term for "reversed" in this instance) the *Cowan* mere-fact approach by limiting prior-conviction impeachment to felonies of dishonesty, such as perjury, forgery, counterfeiting, passing bad checks, theft, and stealing, among others; but with respect to those convictions, allowing the cross-

not allow "mere-fact" impeachment under any circumstances).

20. KRE 609(a).

21. *United States v. Osazuwa*, 564 F.3d 1169 (9th Cir.2009).

22. *Hill*, 801 N.W.2d at 652 (identifying Kentucky, Nebraska, Wisconsin, and Virginia as the only states to limit prior-conviction impeachment to the "mere fact" of the conviction only).

23. Westlaw searches, at any rate, for language along the lines of "the identity of the crime upon which conviction was based may not be disclosed" return no rule but ours.

24. 407 S.W.2d 695 (Ky.1966).

25. *Id.* at 698.

26. *Id.*

27. *Cotton v. Commonwealth*, 454 S.W.2d 698, 701 (Ky.1970).

examiner, subject to the discretion of the trial court, to introduce the nature of the underlying crime and background facts "relevant to the issue of credibility."[28]

Following *Cotton*, the Court took the third step toward KRE 609 in *Commonwealth v. Richardson*.[29] The defendant in *Richardson* was charged with burglary; and when he testified at trial, the Commonwealth was permitted to impeach him with the fact that he had previously been convicted of another burglary. Although proper under *Cotton*, this impeachment of Richardson seemed to the Court so unduly prejudicial as to invalidate the balance the *Cotton* court had attempted to strike between the rights of defendants and of society in the trial of criminal cases. The Court, therefore, overruled *Cotton* and returned to the strict mere-fact approach of *Cowan*:

> In future cases, the [impeachment] rule will be construed essentially as in *Cowan, supra,* so that a witness may be asked if he has been previously convicted of a felony. If his answer is "Yes," that is the end of it[;] and the court shall thereupon admonish the jury that the admission by the witness of his prior conviction of a felony may be considered only as it affects his credibility as a witness, if it does so. If the witness answers "No" to this question, he may then be impeached by the Commonwealth by the use of all prior convictions[;] and to the extent that *Cowan* limits such evidence to *one* prior conviction, it is overruled. After impeachment, the proper admonition shall be given by the court.... Identification of the prior offense or offenses, before the jury, by either the prosecution or defense, is prohibited[;] and any language

to the contrary in *Cotton, supra,* and its progeny is specifically overruled.[30]

*Richardson* was decided in 1984. Six years later, its strict mere-fact approach to prior-conviction impeachment was codified in the new KRE 609, including expressly its disallowance of any "identification of the prior offense."

Today, the pendulum swings back toward *Cotton*. For reasons much like the ones offered in *Cotton*, the Court now "construes" KRE 608 and 609 to allow a cross-examiner to ask a previously convicted witness about the facts underlying the prior conviction, provided those facts are deemed relevant to the witness's credibility. This is simply *Cotton* with the caveat that the questioner must now choose between asking whether the witness was convicted and asking what he did. Under the Court's new rule, the jury may now hear that the witness has engaged in felonious conduct—even conduct like that of which he is accused—without hearing that he has been punished for it. The risk of prejudice in that scenario is arguably even greater than that posed by the *Cotton* approach without the caveat. For witnesses with multiple prior felony convictions, moreover, the difference between the Court's new rule and *Cotton* would seem to be negligible, as presumably the witness could be asked about the fact of conviction A and about the facts underlying conviction B.

Even if I were not convinced that the Court's new rule is simply the resurrection of an approach to impeachment, the rejection of which is expressly embodied in KRE 609, I could not go along with it because as I read our rules, KRE 608 does not contemplate or allow for the right of

---

**28.** *Id.* at 702.

**29.** 674 S.W.2d 515 (Ky.1984).

**30.** *Id.* at 517–18.

"election" the majority reads into it. KRE 608 is modeled upon and follows closely FRE 608, which admittedly is hardly a model of clarity. I agree, however, with those federal courts that understand the express provision within rule 608(b) limiting its application to instances of conduct "other than conviction of crime as provided in rule 609," as assigning to rule 609 the exclusive regulation of witness impeachment where the impeachment relates to a prior conviction.[31] Were it otherwise, as the United States Court of Appeals for the Ninth Circuit observed in *Osazuwa*, then the backdoor of rule 608 would render nugatory the limitations imposed by rule 609.[32] Such a backdoor reading does not harmonize the two rules; it makes them conflict. In as much as our rule 609 is even more restrictive than the federal one, undoing the restrictions with rule 608 is, in our case, even farther from the drafters' intent. So far, indeed, is the majority's new rule from *Richardson* and its embodiment in KRE 609 that it must be understood, not as a construction of the rules but as an amendment of them; and I do not favor amendment in this manner.

All of that said, I hasten to add that I share, fully, the majority's willingness to revisit our strict mere-fact approach to witness impeachment. As today's case illustrates, whatever may be the virtues of simplicity, the failure of our KRE 609 to make any distinction between testifying defendants and non-defendant witnesses; to make any distinction between crimes of dishonesty and other crimes; to address expressly misdemeanor convictions; or to

indicate clearly how the two rules, KRE 608 and KRE 609, are to work together can have the ironic effect of significantly hampering the very defendant the rule's strict simplicity was designed to protect. This is a problem, and there is no easy solution. The interests involved crisscross in complicated ways, as the contentious history of the federal rules, the wide diversity of state approaches, and our own see-sawing back and forth between *Cowan* and *Cotton* would suggest. While caution is appropriate in the face of such complexity, KRE 609 has not been amended for over twenty years. I agree with the Court that a reassessment of our practice is in order; but I firmly believe that it should be carried out with the benefit of the full rule-making process, not by straining current rules beyond their intent.

While I disagree with the majority that Allen should have been allowed to ask about Weaver's criminal acts on cross-examination under KRE 608(b) and 609, I would hold that Allen's due-process right to present a defense should trump the rules in this particular case. So I concur in the majority's result remanding the case for retrial.

The analysis does not stop with the conclusion that the evidence rules prevent the introduction of a particular piece of evidence, which the defendant claims is essential to her defense. When the rules of evidence exclude evidence, the question becomes whether the evidence excluded "amounts to either an arbitrary or a dis-

---

**31.** *Childers*, 332 S.W.3d 64 (collecting federal cases). As the Court correctly observes, our rule 609, by disallowing impeachment with misdemeanor convictions, including misdemeanor convictions for crimes of dishonesty, creates an anomaly that the federal rules do not. Under our rules, a convicted misdemeanant cannot be impeached, whereas a

witness guilty of the same dishonest behavior but not convicted of a crime may be asked about that behavior under rule 608. Were the Court content to restrict its holding to this misdemeanor anomaly, I would be far less inclined to object.

**32.** 564 F.3d at 1173–75.

proportionate application" of the rules.[33] "[I]n several cases[,] the United States Supreme Court has held that a defendant's constitutional right to present a meaningful defense trumped an evidentiary rule."[34] Although case law does not refer to it as such, this inquiry is essentially an as-applied constitutional challenge to the rules of evidence: does application of the rules of evidence in this particular case result in an unfair trial.

This Court recently explained the appropriate analysis in *McPherson v. Commonwealth*[35] and *Montgomery v. Commonwealth*.[36]

> [T]he United States Supreme Court has made clear that evidence rules are not to be applied so as to deprive a defendant of due process[;] and in a criminal trial[,] " 'due process is, in essence, the right to a fair opportunity to defend against the State's accusations.' " "An exclusion of evidence will almost invariably be declared unconstitutional," we have observed, "when it 'significantly undermine[s] fundamental elements of the defendant's defense.' " ... [T]he Supreme Court has held, the defendant's interest in the challenged evidence must be weighed against the interest the evidentiary rule is meant to serve, and only if application of the rule would be arbitrary in the particular case or disproportionate to the state's legitimate interest must the rule bow to the defendant's right.[37]

The Supreme Court has established a balancing test to evaluate, on a case-by-case basis, constitutional challenges to the exclusion of evidence.[38] "Under that test, courts must determine whether the rule relied upon for the exclusion of evidence is arbitrary or disproportionate to the State's legitimate interests.[39]

> An evidentiary exclusion is not arbitrary if it meaningfully furthers a valid purpose the rule was meant to serve. In determining whether the exclusion is disproportionate, courts have weighed "the importance of the evidence to an effective defense, [and] the scope of the ban involved" against any prejudicial effects the rule was designed to guard against. Exclusions have been found invalid where the probative value of the excluded evidence was substantial, and where the trial court failed to consider its probative value, but they have been upheld where the probative value of the excluded evidence was deemed slight[.][40]

I would hold here that Allen's due process right to present a defense trumps the application of KRE 608(b) and 609. Weaver, the prosecution's key witness, pleaded guilty to twenty-five felony counts of first-degree criminal possession of a forged instrument and two misdemeanor counts of giving a false name to a peace officer. Allen sought to inquire about the specific conduct underlying the convictions. Namely, that Weaver was found with counterfeit money in his car and gave a false name to the arresting officer twice.

33. *McPherson v. Commonwealth*, 360 S.W.3d 207, 215 (Ky.2012).

34. *Montgomery v. Commonwealth*, 320 S.W.3d 28, 40 (Ky.2010) (citations omitted).

35. 360 S.W.3d 207.

36. 320 S.W.3d 28.

37. *McPherson*, 360 S.W.3d at 214 (citations omitted).

38. *Montgomery*, 320 S.W.3d at 42.

39. *Id.* (citations and internal quotations omitted).

40. *Id.* (citations omitted).

Allen's entire defense was that Weaver forged her name on the loan documents. The conduct underlying Weaver's prior convictions lies at the heart of this defense. Allen's intent in introducing this evidence goes beyond a general attempt to discredit Weaver as being less likely to be truthful in his testimony because of his misdemeanor convictions. The introduction of evidence of a prior crime for this purpose is "a general attack on the credibility of the witness." [41] In the general situation, the right to present a defense would not typically abrogate the Rules of Evidence. But, here, the conduct underlying the conviction—counterfeiting and lying to the police—supported Allen's defense that Weaver forged her name on the loan documents and lied to the police about it.

As stated by the majority in its conclusion that exclusion of the evidence was not harmless, Allen's primary defense was that Weaver forged her signature on the loan documents and lied about her involvement. The proof Allen sought to introduce went to the core of her defense and would have impeached the character and credibility of the Commonwealth's star witness. Weaver's credibility, or lack thereof, was Allen's only defense. In this case, the probative value of the excluded evidence outweighs the prejudicial effects the rule was designed to guard against.

So while I disagree with the majority's reading of KRE 608(b) and 609, I would hold that Allen's due process right to present a defense trumps the rules in this particular case. Accordingly, I concur in the majority's result remanding Allen's case for a new trial.

ABRAMSON, J., joins.

---

41. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).