# Supreme Court of Kentucky

2019-SC-0449-MR

KAREN M. BRAFMAN                                                   APPELLANT

ON APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JOHN L. ATKINS, JUDGE
V.                                   NO. 2018-CR-00370

COMMONWEALTH OF KENTUCKY                                            APPELLEE

## ORDER CORRECTING

The Opinion of the Court rendered December 17, 2020 is corrected on its face by substitution of the attached Opinion of the Court in lieu of the original Opinion or the Court.

Said correction does not affect the holding of the original Opinion of the Court.

ENTERED: December 21, 2020

_____
CHIEF JUSTICE

CORRECTED: DECEMBER 21, 2020
RENDERED: DECEMBER 17, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0449-MR

KAREN M. BRAFMAN                 APPELLANT

ON APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JOHN L. ATKINS, JUDGE
V.                    NO. 2018-CR-00370

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**REVERSING AND REMANDING**

A circuit court jury convicted Karen M. Brafman of first-degree and second-degree arson and six counts of attempted murder, of which four were charged as hate crimes. She received a life sentence consistent with a jury's recommendation. She now appeals from the resulting judgment as a matter of right,[1] claiming at least six trial errors require reversal, either individually or cumulatively.

We find the prosecutorial misconduct in this case severe enough to warrant reversal on its own, reviewing other issues likely to arise in the event of a retrial. Accordingly, we reverse the judgment and remand for a second trial.

---

[1] Ky. Const. § 110(2)(b).

# I.  FACTUAL BACKGROUND

Brafman and the victims lived next door to one another in neighboring trailers.  One of the victims is an African-American man, Craig Calloway, who lived with the other victims, Ashley Webster, a white woman, and their several children.  Webster had three children from past relationships and three biracial children with Calloway.  Brafman had been relatively friendly with both Calloway and Webster and was apparently introduced to them through her ex-boyfriend and former cohabitant, David Sova.[2]

Brafman has struggled with mental-health issues for much of her life, having been institutionalized as young as 8-years-old.  Her diagnoses include post-traumatic stress disorder, bipolar disorder, and depression.  Brafman testified at trial that by the night of the arson she had not slept for five days, during which she claims to have consumed as much methamphetamine, ecstasy, and whiskey as she could in response to a breakup with Sova and the loss of custody of her child.  Additionally, Brafman was not taking any of her psychiatric medications at the time.  In general, Brafman's mental illness was likely compounded by her drug consumption and life stressors.

The day before her arrest, Brafman spent the day doing yardwork and consuming illicit substances with Calloway.  Webster testified that early the following morning, at around 2:30, Brafman visited Calloway and Webster's trailer asking for a cigarette.  When Webster told Brafman they had none, Brafman returned to her trailer.  At about 5:30 a.m., Webster awoke to the

---

[2] Calloway would sometimes visit and borrow tools, would spend time with Sova on occasion, and apparently knew Brafman on a personal level.

smell of smoke. Webster went outside to find fires burning at both ends of the trailer, one on Webster and Calloway's side and one on the side where the children were sleeping. Four of Webster's children were home that night. Webster and Calloway were able to extinguish the fires before the fire department arrived and before any major structural damage was sustained.

Arson investigator Detective Steward responded to and examined the scene. The person who started the fire tried to use a siphon and kerosene heater. After inspecting the site of the fire, Steward went next door to speak with Brafman, who had been seen watching the scene from afar and was leaving her trailer on foot before Steward stopped her. Brafman had just taken a shower and was running her laundry through the wash. With Brafman's permission, Steward inspected the laundry, finding it smelled strongly of kerosene. Brafman was then arrested and charged with arson and attempted murder.

Brafman maintained at trial that because of intoxication she did not remember anything that happened between the time she asked Webster for a cigarette around 2:30 in the morning and approximately the time she was arrested a few hours later. Indeed, Brafman's voir dire and opening statement contemplated voluntary intoxication as a legal defense, specifically that she was too intoxicated to form criminal intent or to remember what happened. But Brafman was the only witness to testify to her intoxication. She introduced at trial no other corroborating evidence of intoxication. Later, as the trial court settled on the jury instructions, defense counsel requested a

voluntary-intoxication instruction.  The trial court denied the request for lack of corroborating evidence of intoxication.

The jury convicted Brafman on all charges.  The jury recommended a life sentence for the first-degree arson, ten years for second-degree arson, fifteen years for each attempt against Calloway and Webster, and twenty years for each of the four attempted murders of the children.  The Commonwealth moved the trial court to enhance the charges as hate crimes, which the trial court granted as to the four attempts on the lives of the children but not as to Calloway or Webster.

## II. STANDARD OF REVIEW

Brafman raises several issues that were variously preserved or not preserved by timely objection.  In general, preserved issues will be reviewed for error.[3]  If an error is identified, we next determine whether it was harmless, i.e., whether we can say with fair assurance that the error did not substantially sway the verdict or result against the defendant.[4] If there is no error or the error was harmless, we will affirm.  If a preserved error has constitutional implications, we will affirm only if the error was harmless beyond a reasonable doubt.[5]

---

[3] Rule of Criminal Procedure (RCr) 9.24.  *See Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013).

[4] *Allen v. Commonwealth*, 395 S.W.3d 451, 467 (Ky. 2013). To say there is a likelihood the verdict was "substantially swayed" by an error has been said to mean the reviewing court is left in "grave doubt" as to the error's harmlessness. *See id.* (quoting *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009)).

[5] *Nunn v. Commonwealth*, 461 S.W.3d 741,750 (Ky. 2015) (citing *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 n.1 (Ky. 2009)).  *See Crossland v. Commonwealth,* 291 S.W.3d 223, 231 (Ky. 2009) ("Errors of constitutional import—the

4

We review unpreserved issues for palpable error.[6] Palpable error will compel us to reverse only where the error substantially affects the rights of the defendant in a way so obvious and serious that we find there to be manifest injustice.[7]

### III.      ANALYSIS

**A. The trial court did not abuse its discretion when it refused to instruct the jury on the defense of voluntary intoxication.**

Brafman argues that she was deprived of her right to present a full defense when the trial court declined to instruct the jury on her defense of voluntary intoxication.  Brafman properly preserved the issue by requesting and offering the intoxication instruction at trial,[8] so we review the trial court's decision not to give the instruction for abuse of discretion and harmless error.[9]

The only evidence admitted at trial of Brafman's intoxication was her own testimony in which she claimed to have been awake for five days straight consuming substantial amounts of whiskey, methamphetamine, and ecstasy. The general effect, she alleged, was that she could not recall anything between her visit to Calloway's trailer at 2:30 AM and approximately the time of her arrest around 5:30 AM, and therefore she could not form the criminal intent

---

most fundamental and serious type of errors—are generally analyzed under a harmless error standard.").

[6] RCr 10.26.

[7] *See Nunn*, at 751 ("Palpable error is essentially comprised of two elements: obviousness and seriousness.").

[8] RCr 9.54(2).

[9] *Breazeale v. Commonwealth*, 600 S.W.3d 682, 691 (Ky. 2020) (citing *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006)); *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015) ("When the question is whether a trial court erred by. . . not giving an instruction that was required by the evidence[,] the appropriate standard for appellate review is whether the trial court abused its discretion.").

necessary to be convicted of arson or attempted murder. The trial court refused to give the instruction because it found Brafman's testimony alone insufficient to support the defense as a matter of law.

A criminal defendant has a basic constitutional right to present a defense, and this entitles the defendant to jury instructions that give effect to a defendant's theory of the case.[10] From this right, a duty is correspondingly imposed on the trial court to instruct on the whole law of the case.[11] Indeed, "a trial court is required to instruct the jury on affirmative defenses and lesser-included offenses if the evidence would permit a juror reasonably to conclude that the defense exists or that the defendant was not guilty."[12]

While instructing the jury in a particular way is a discretionary function of the trial court,[13] a trial court must be especially inclined to give instructions that go to the defendant's state of mind, such as mistake or intoxication.[14] "Intoxication . . . is a defense to an intentional crime if the effect of the intoxication is to completely negate the element of intent; it causes the defendant's mental state to equate with insanity. Voluntary intoxication

---

[10] *Id.*

[11] *See id.* (citing RCr 9.54); *Holt v. Commonwealth*, 219 S.W.3d 731 (Ky. 2007).

[12] *Breazeale*, at 691 (citing *Luna v. Commonwealth*, 460 S.W.3d 851, 882 (Ky. 2015)); *Harris v. Commonwealth*, 313 S.W.3d 40, 50 (Ky. 2010).

[13] *See Sargent*, 467 S.W.3d at 202–03.

[14] *Grigsby v. Commonwealth*, 187 S.W.2d 259, 261–62 (Ky. 1945) ("[W]here the defendant proves facts or circumstances to excuse his act which otherwise would in and of itself be a crime, or the specific issue is one of criminal intent, such as where there is a claim of accident, self-defense or mental capacity, ordinarily an affirmative instruction should be given.").

negate[s] specific intent."[15] Attempted murder is, of course, a specific-intent crime in which the defendant's mental state is a central issue and which Brafman aimed to negate by alleging intoxication.[16] First-and second-degree arson are also both crimes that require specific intent.[17]

In *Mishler v. Commonwealth*,[18] we held that the trial court committed reversible error by not giving a voluntary-intoxication instruction for a defendant named Skaggs charged with armed robbery. Skaggs's narrative and defense were that, having consumed marijuana and "speed" that day, he was so intoxicated during the robbery that he blacked out during the commission of the robbery, so he could not form the requisite intent for robbery. Skaggs's coconspirators generally corroborated Skaggs's intoxication. Yet, curiously, Skaggs was able to recall with significant detail the events immediately before and after the robbery, such as selecting a specific grocery item and proceeding to the cash register. Even with corroboration, his intoxication defense was patently implausible.

---

[15] KRS 501.080; *id.* There must be evidence that the intoxication was so severe that the defendant did not know what she was doing, not that she was merely drunk. *King v. Commonwealth*, 513 S.W.3d 919, 923 (Ky. 2017).

[16] *See Nider v. Commonwealth*, 140 Ky. 684, 131 S.W. 1024, 1026–27 (Ky. 1910). ("An attempt is *an intent to do a particular thing* which the law has declared to be a crime, coupled with an act towards the doing.") (emphasis added).

[17] Both require the defendant intentionally start a fire for the specific purpose of destroying or damaging the building. KRS 513.020 ("with intent to destroy or damage a building, he starts a fire or causes an explosion") and 513.030 ("when he starts a fire or causes an explosion with intent to destroy or damage a building").

[18] 556 S.W.2d 676 (Ky. 1977).

The *Mishler* Court fully acknowledged the preposterousness of Skaggs's defense[19] but found error in the trial court's refusal to give the intoxication instruction. This Court maintained that Skaggs had a right to present the defense under such facts, not necessarily because Skaggs's intoxication happened to be corroborated, but because state-of-mind issues should generally be given to the jury for deliberation.[20]

But recently in *Bratcher v. Commonwealth*,[21] a bail jumping case, we held that a defendant was not entitled to a voluntary-intoxication instruction where the only evidence of intoxication was his own general testimony about the common effects of his drug consumption.[22] We note briefly before proceeding that *Bratcher* was resolved by an unpublished opinion. We discuss it now for demonstrative purposes, not because we are bound by its language.[23]

Bratcher testified that he was so blacked out from meth consumption at the relevant time that he "couldn't remember what city he was in."[24] But "[u]nlike in *Mishler*, Bratcher did not present any other evidence beyond his own testimony, which was at times inconsistent, to support his claim that he was so intoxicated that he did not know what he was doing. . . ."[25] We refrained

---

[19] *Id.* at 680.

[20] *Id.* ("Nevertheless, it is the privilege of the jury to believe the unbelievable if the jury so wishes.").

[21] No. 2019-SC-000135-MR, 2020 WL 2091864 (Ky. Apr. 30, 2020) (memorandum order and opinion designated as NOT to be published).

[22] *Id.* at *4.

[23] CR 76.28(4)(c).

[24] *Bratcher*, at *1.

[25] *Id.* at *2.

8

from imposing a hardline rule that testimony must always be corroborated to warrant an instruction,[26] but we held that it was generally not an abuse of discretion for the trial court to refuse an instruction without more.[27]

Brafman's testimony would support the finding of a serious enough level of intoxication for a voluntary intoxication defense, warranting an instruction. But Brafman's testimony was not corroborated. To be discussed shortly, her intoxication would have been strongly corroborated had her counsel cross-examined Detective Steward and asked his observations at the time of arrest, but Brafman's counsel did not question Steward at all. We cannot say that the trial court abused its discretion by refusing to give the instruction for voluntary intoxication, because it was not corroborated by evidence admitted at trial. Accordingly, we are constrained to conclude that the trial court did not abuse its discretion by declining to give the tendered intoxication instruction.

## B. Brafman was denied a fair trial when the Commonwealth, aware of Brafman's intoxication, opposed the intoxication-defense instructions and implied to the jury Brafman was not intoxicated.

Brafman next alleges that the Commonwealth's Attorney rendered her trial unfair when he did not press Detective Steward on direct examination about whether Brafman appeared intoxicated during her arrest and then when he later characterized Steward's testimony to suggest there was no evidence of

---

[26] *Id.*, n. 25 ("This standard is not intended to establish a bright-line rule that, as the Commonwealth argues here, a defendant is never entitled to a jury instruction on the defense of voluntary intoxication based solely on his own testimony at trial. A case may come before a Kentucky court where a defendant provides such specific testimony regarding the effects of his or her drug or alcohol use during the time of the offense charged that it would be an abuse of discretion for a trial court to refuse to include a jury instruction on the defense of voluntary intoxication.").

[27] *Id.* at *4.

9

intoxication. Because the Commonwealth's knowledge of Brafman's intoxication was not revealed until after trial, the issue could not have been preserved. We ordinarily review unpreserved issues of alleged prosecutorial misconduct for palpable error.[28]

This claim of error is based largely on post-trial revelations. Detective Steward, an arson investigator and Brafman's arresting officer, was called to the stand and questioned by the Commonwealth's Attorney. The Commonwealth's Attorney asked Steward if he observed anything "interesting" in his interaction with Brafman immediately leading up to her arrest. Steward shared a few of his observations about what he saw in Brafman's trailer, but he did not testify that Brafman was visibly intoxicated. For some reason, Brafman's defense counsel chose not to cross-examine Steward.

In the record on appeal, Brafman provided courtroom video footage of the Commonwealth's Attorney conversing with Detective Steward during a lunchtime recess. Steward had just left the stand before recess. In this video, Steward describes observing Brafman "out of her fricking mind" and "meth-ed out." Evident from this conversation was clearly an understanding to avoid mentioning Brafman's intoxication:

> Boling (Commonwealth's Attorney): I thought about putting you back on and saying 'did she look like she was high?
> Steward: Well, she was out of her frickin' mind.
> Boling: That's why I didn't ask that question (laughter).
> Steward: Yeah and I didn't want to answer that question so…
> Boling: You see that's why I didn't go there because I'm thinking you know she was all over the place.
> Steward: She was.

---

[28] *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010).

10

Boling: And none of that is in the record. As far as what the record has in it is she took a shower.

The Commonwealth's Attorney later stated in closing argument as follows:

> "It's not drugs, it's not high. *Not one single witness testified to you that she appeared under the influence, intoxicated, drugged or anything.* Not one. Deputy Sanderson testified. He talked to her. Did he say, 'Man, she looked like she was high. She looked like she was crazy. She didn't know what she was doing.'? No. *Detective Steward testified. Did he testify to that? No.*"[29]

Brafman argues that these statements, while technically true, deliberately mischaracterize the facts. This, she alleges, was prosecutorial misconduct resulting in palpable error. The Commonwealth counters that even if the facts were "misstated" as Brafman alleges, these misstatements did not pertain to any admitted evidence like the statements did in *Duncan v. Commonwealth*,[30] and thus any error was not palpable or outcome-determinative. We think that considering the closing argument, the prosecutor engaged in misconduct constituting palpable error warranting reversal.

Prosecutorial misconduct can assume many forms, including improper testimony and improper closing argument.[31] As we review for palpable error,[32] we will reverse only if the alleged misconduct was flagrant or, where a contemporaneous objection was made, the proof of guilt is not overwhelming

---

[29] (emphasis added).

[30] 322 S.W.3d 81 (2010).

[31] *Duncan*, at 87 (citing *Brown v. Commonwealth*, 313 S.W.3d 577 (Ky. 2010)); *State v. Sing*, 259 Conn. 693, 793 A.2d 226 (2002).

[32] *Duncan*, at 87.

11

and the trial court failed to cure the misconduct with a sufficient admonition.[33] Since there was no contemporaneous objection to this error,[34] we must find the misconduct flagrant in order to reverse on this claim of error. Misconduct is "flagrant" if it "render[ed] the trial fundamentally unfair."[35] The Court weighs four factors to determine whether improper conduct is sufficiently flagrant to require reversal, namely (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.[36] We look at the claimed error in context to determine whether, as a whole, the trial was rendered fundamentally unfair.[37]

In the context of this criminal trial where specific intent was disputed by the defendant's testimony of intoxication, the Commonwealth's Attorney carefully crafted his questioning to avoid eliciting evidence of Brafman's intoxication. That is not improper. That is not misconduct. The Commonwealth is not obligated to make the defendant's case for her. The defendant is not the Commonwealth's client. It is, therefore, incumbent on the defense to elicit such information by means available to it, such as by cross-examination. The defense here declined to question Steward at all. But the

---

[33] *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016).

[34] Of course, because this instance of purported misconduct was not known until the video record was viewed on appeal, there was no contemporaneous objection, much less any admonition from the trial court.

[35] *See id.* (citing *Duncan*, at 87).

[36] *Id.* (citing *Mayo v. Commonwealth*, 322 S.W.3d 41, 55 (Ky. 2010)).

[37] *Id.* (citing *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006)).

context here must be emphasized: it was understood and later discovered, at least between Steward and the Commonwealth's Attorney, that Brafman was visibly "out of her frickin' mind," in Steward's own words, at the time of her arrest. Still, merely omitting this fact is not necessarily misconduct.

What is "flagrant" is the Commonwealth's Attorney's step taken beyond the lunchtime discussion to make the argument in closing argument that no one saw Brafman intoxicated. It is true that Steward did not testify on the stand that Brafman was intoxicated during the ordeal. He did not say she was "meth'd out" until after he left the stand. But the Commonwealth's Attorney went a step further by directing the jury away from what he knew was both material to the case and true, asserting emphatically that no one *testified* to Brafman's intoxication. And of course, the Commonwealth's Attorney later argued against the instruction to secure the conviction with ease. Significantly, had the trial court been exposed to testimony from Steward about what he observed, it would have been obligated to give the intoxication instruction.[38] Having established this important context, we weigh the four factors.

The first factor weighs in Brafman's favor quite substantially, as the Commonwealth's closing argument, made directly and emphatically to the jury, was clearly capable of misleading the jury away from the truth known to the Commonwealth's Attorney at that time. If we imagine ourselves in the jury's position at closing argument, with all the information available and not

---

[38] *See* Part III.A.

available to it, the Commonwealth's Attorney's statements punctuated the isolation of Brafman's testimony in the minds of the jurors, making the intoxication defense appear totally fabricated when it was not true. He did not merely argue that Brafman was lying, nor did he simply cast doubt on the defense's narrative. He practically argued there was no evidence, admitted at trial or otherwise, of Brafman's intoxication. Brafman's intoxication was not a tangential issue. The argument, pertaining directly to Brafman's theory of the case and delivered directly to the jury, was likely to mislead it to the point of seriously prejudicing Brafman.

Further, the Commonwealth's Attorney's actions were not "extensive," but they were not isolated, either. His actions were deliberate and calculated. He towed technical lines, asserting merely that no one had *affirmatively* testified to Brafman's intoxication on the stand, and he knew the advantage he was gaining thereby, namely a certain conviction. His assertion must be understood in the context of his deliberately vague questioning of Steward, Steward's avoiding Brafman's intoxication as something that might be "interesting" to report to the jury, and then, of course, the Commonwealth's Attorney's closing argument to the jury that suggested Brafman was sober, that Steward had observed nothing, when he knew the opposite was true. So the Commonwealth's Attorney's actions were not isolated, and they were not accidental.

Finally, the strength of the evidence against Brafman is quite strong, perhaps overwhelming as to some issues. There is close to no dispute that Brafman in fact started the fires. The evidence also seems to demonstrate

14

criminal intent, at least based on the complexity of her attempt to burn the trailer followed by her attempts to cover up the evidence. But the other three factors weigh strongly enough in Brafman's favor to warrant reversal. The very acts that misdirected the jury from a crucial, relevant truth about Brafman's intoxication were the same that deprived Brafman of the corroboration necessary to receive an intoxication instruction.

A prosecuting attorney has a broader duty to the public and to our system of justice than to obtain convictions.[39] The Commonwealth's Attorneys "represent[] the people of this state, and in a degree should look after the rights of a person accused of a crime by endeavoring to protect the innocent and seeing that truth and right shall prevail."[40] The prosecutor has the duty to see that the innocent are acquitted as much as it to see that the guilty person is convicted.[41] "It is his duty to present his cause fairly, and not impress upon the jury any deduction that is not from the evidence strictly legitimate."[42] This is not just a general legal duty. It is also imposed specifically and directly on prosecuting attorneys by our Rules of Professional Conduct.[43]

---

[39] *Bailey v. Commonwealth*, 237 S.W. 415, 417 (Ky. 1922). *See* SCR 3.130(3.8), cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.").

[40] *Bennett v. Commonwealth*, 28 S.W.2d 24, 26 (Ky. 1930).

[41] *Dalton v. Commonwealth*, 287 S.W. 898, 900 (Ky. 1926).

[42] *Id.*

[43] SCR 3.130(3.8)(c) ("The prosecutor *at all stages* of a proceeding shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

In this case, our concern is not that the ultimate outcome was necessarily incorrect. We cannot escape the impression this trial was rendered fundamentally unfair, that a conviction was obtained by gratuitously surreptitious means. We acknowledge the latitude ordinarily afforded to the Commonwealth's Attorney to express a theory of the case in closing argument, even with considerable leeway to add flair and narrative consistency. But what was done here went beyond arguing and construing facts to misleading the jury from the truth on a highly material issue.[44] The conduct went beyond mere advocacy and prosecutorial zeal. It was unnecessarily exploitative and dishonest.

We reverse for flagrant prosecutorial misconduct. It is better that this prosecution be done right.

## C. There was insufficient evidence to support the trial court's hate-crime designations.

Here, the facts of record are not in dispute. Brafman at some point, maybe on separate occasions, called Webster's biracial children "Oreos." The Commonwealth also introduced at trial an unauthenticated text to Sova's phone that read "I'm going to kill the N**** and u," purportedly referring to Calloway. Finally, according to Webster, Brafman had at some point or another uttered racial slurs from her porch. This was the evidence introduced of Brafman's racial prejudice. In each instance, the record is unclear as to

---

[44] *Caudill v. Commonwealth*, 374 S.W.3d 301, 309 (Ky. 2012) (citing *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132–33 (Ky. 2005)) ("While it is the duty of the prosecutor to advance the Commonwealth's case with persuasiveness and force, he or she has a concomitant duty not to derogate from a fair and impartial criminal proceeding.").

when these statements were made, in what context they were made, and to whom the racial expletive refers.

At sentencing, the Commonwealth moved to designate the charged offenses as hate crimes. The trial court granted the motion as to the attempted murders of the four children, stating

> "On counts three, four, five and six, in consideration of the fact that the jury found you guilty of attempted murder of the children and sentenced you to five additional years over and above the sentences they imposed for the adults, I find that those four convictions are in fact hate crimes."

Notably, the trial court did not enhance the charge as to Calloway, who was also an African-American victim in this case, having been in the trailer with the four children at the time the fires were set outside.

KRS 532.031(1) provides that "[a] person may be found by the sentencing judge to have committed an offense specified below as a result of hate crime if the person intentionally *because of* race, color, religion, sexual orientation, or national origin of another individual or group of individuals" commits or attempts to commit arson or murder against the victim.[45] KRS 532.031(2) provides a standard for hate-crime enhancement:

> "At sentencing, the sentencing judge shall determine if, by *a preponderance* of the evidence presented at the trial, a hate crime was a *primary* factor in the commission of the crime by the defendant. If so, the judge shall make a written finding of fact and enter that in the court record and in the judgment rendered against the defendant."[46]

---

[45] (emphasis added) (language rephrased and list of applicable criminal statutes omitted for simplicity).

[46] (emphasis added). KRS 532.031(4) allows the sentencing judge to use a hate-crime determination to delay or deny parole. The statute does not create an independent crime.

17

We have interpreted the statute to require the trial court to make a finding of fact as to racial motivation and then determine that it was the main motivation behind the criminal act, not necessarily the only reason or a causal "but for" reason.[47]  With the facts here largely undisputed, we review the trial court's decision to enhance Brafman's charges for abuse of discretion.[48]

*Burke v. Commonwealth* is the seminal case in Kentucky in which a trial court applied the hate-crime statute to several assault charges.  In that case, a verbal altercation at a gas station escalated to violence between the defendant, Burke, and the victims.  Just before the physical altercation and then while assaulting the first victim, Burke used derogatory slurs to refer to a victim's apparent sexual orientation as a lesbian woman.[49]  Three men in a van came across the altercation as it was happening and were also assaulted by Burke when they attempted to intervene.  The trial court later held that all four assaults were hate crimes.  We reversed the hate-crime designation as to the three men, finding no evidence that they were victims because of any suspect class-based motivation.

We required in *Burke v. Commonwealth* that the Commonwealth prove a sufficient nexus between an evident suspect motivation and the criminal act.[50]  We reasoned that it was evident Burke's assault of the female victim may have

---

[47] *Burke v. Commonwealth*, 506 S.W.3d 307, 317 (Ky. 2016).

[48] *See Burke*, at 317 (noting under KRS 532.031(1) the use of permissive "may" in creating a discretionary function in the court); *Howard v. Commonwealth*, 496 S.W.3d 471, 475 (Ky. 2016) ("Kentucky statutory law affords trial courts immense discretion in setting criminal penalties.").

[49] Sexual orientation is a protected class under KRS 532.031.

[50] *Id.* at 318.

been motivated by bias against her perceived sexual orientation, at least based on the names he called her. But while the assault of the three men was part of the same general event, the derogatory statements were of a nature that could not have referred to the men. No connection existed between the defendant's remarks and his assault of the three men, so a sufficient motivational nexus did not exist. Thus, Burke's assaults of those men were not properly enhanced as hate crimes.

Here, the record contains insufficient evidence that Brafman was primarily motivated by racial prejudice, even if her statements are evidence of a general disrespect or prejudice toward African-Americans. Even assuming their admissibility, these statements and slurs were made without reference or connection to this arson. We cannot tell when these statements were made. We do not know the context in which they were made. The Commonwealth offered no authentication as to who sent the screenshotted text messages or who the subjects, "whores" and others, were exactly. However offensive and distasteful, uttering racial slurs at some undetermined point in the past is not enough to establish a sufficient evidentiary nexus of primary racial motivation to commit a crime. While it is unclear why Brafman may have committed the charged crimes, we cannot say that a racial motivation was demonstrated. The temporal and contextual connection between a demonstrable racial animus and a criminal act must be shown by more than a racial slur or crude joke uttered by the defendant at an unknown time, place, and context.

Additionally, the trial court's application of the hate crime to the children seems to be arbitrary, perhaps based on even less evidence than we have just

discussed. The trial court's articulated basis, required by statute,[51] did not even mention these circumstances. The trial court instead stated it was relying on the jury's recommendation that five more years be served for each attempt against the children. If this was the trial court's only basis, that is not enough. Greater recommended sentences without more does not suggest the jury found racial motivation. Further, it would stand to reason that if racial motivation was even considered by the jury in its recommendations, it would have recommended a higher sentence for the attempt on Calloway's life, considering he was African-American. But the jury did not do that. So, for lack of proof of racial motivation, we reverse the trial court's hate-crime enhancement on the evidence presented, at least without greater clarity of context.

### D. We decline to address the adequacy of the attempted-murder instruction.

Brafman claims that the jury instructions given at trial did not require the jury to find every element of attempted murder beyond a reasonable doubt. The first issue Brafman raises is that the jury was instructed to find that Brafman "intentionally attempted to kill [victim]," rather than she "intended to kill [the victim]."[52] The second issue Brafman avers is that the jury was not required to find she took a "substantial step" toward committing the crime. Brafman cites Cooper's Instructions to Kentucky Juries § 10.20 as the

---

[51] KRS 532.031(2).

[52] The trial court's instructions to the jury were as follows:

"You will find the Defendant guilty of Attempted Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about May 12, 2018, and before the finding of the Indictment herein, she intentionally attempted to kill [victim] by starting a fire under the residence that [victim] was inside."

"textbook," model instruction for attempted murder, which provides for separate elemental findings of intent and substantial step.[53]

Since we reverse the judgment and remand this case on other grounds, we decline to address this argument. On remand, we strongly encourage the trial court to choose instructions that more clearly require the jury to find affirmatively each individual criminal element, as the Cooper's Instructions cited above would seem to accomplish.

## E. The screenshot of the text messages was not properly authenticated under KRE 901.

Brafman next argues that the Commonwealth's Exhibit 10 was not properly authenticated, and that even if it were authenticated it constitutes improper character evidence under KRE 404(b). This issue was not preserved, so we review for palpable error.[54]

Exhibit 10 appears to be a screenshot of a short series of text messages, but there is little else to be gleaned from the screenshot on its face. The Commonwealth introduced the exhibit through David Sova's testimony at trial.

---

[53] Cooper's Instruction reads: "You will find the Defendant guilty of Criminal Attempt to Commit Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about [date], and before the finding of the Indictment herein, he [method];

B. That in doing so it was his intention to kill [victim];

AND

C. Under the circumstances as he believed them to be, the Defendant's actions consisted of a substantial step in a course of conduct planned to result in death of [victim]."

Trial courts are left with some discretion to craft instructions as the case at hand may require. *See Sargent*, at 204. However, model instructions like this are properly recognized for their accuracy, clarity, and reliability.

[54] *Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836–37 (Ky. 2003).

21

Sova merely testified that Brafman sent these messages to him. They read, in succession, as follows:

> "Why you're up cooking f****** dope
> F****** whores
> I'm goin to kill the N**** and u
> I should of along time ago
> David that is it for u too
> Watch what happens David [cutoff]"[55]

### 1. *The screenshot was not properly authenticated.*

Tangible evidence such as photographs and writings must be authenticated to be admissible.[56] It must be shown that the material is a true and accurate reflection of what it is purported to be.[57] Whether there is enough evidence of authenticity to admit evidence is within the discretion of the trial court.[58] Typically, the foundational authenticity of a writing can be laid simply by the testimony of someone personally familiar with the writing or by the contents and characteristics of the writing itself.[59] We review this process for abuse of discretion.[60]

We have been presented with a similar issue in *Wilson v. Commonwealth*[61] an unpublished case concerning a shooting in which the

---

[55] Commonwealth's Exhibit 10.

[56] KRE 901.

[57] *Turpin v. Commonwealth*, 352 S.W.2d 66, 67 (Ky. 1961).

[58] *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004).

[59] KRE 901(b)(1) ("Testimony that a matter is what it is claimed to be.") and 901(b)(4) ("Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.").

[60] *Johnson*, at 566.

[61] *Wilson v. Commonwealth*, No. 2014-SC-000392-MR, 2015 WL 5655524 (Ky. Sept. 24, 2015) (designated as NOT to be published).

Commonwealth sought to admit text messages into evidence against a criminal defendant implicated in the shooting. In *Wilson*, two witnesses with personal knowledge of the defendant's phone number testified that they used that number to contact him. The texts from that number also referred to the sender himself by the defendant's distinctive aliases, "mario" and "pharo." Significantly, the text messages also referred to the shooting in question, implicating the sender directly. Thus, the phone number was connected by testimony to the defendant and the messages themselves were evidently linked the sender to the crime. With this kind of foundational evidence before the trial court, it did not abuse its discretion in admitting the text messages.[62]

In this case, we observe several things about the screenshot's characteristics that bear on its authenticity. The messages are shifted to the left of the conversation interface to show that they were apparently received by the person who took the screenshot. Sova apparently received these messages, as he testified, and is the person whom the messages address, especially since the messages refer to "David" in the second person.

Nothing about the screenshot links the messages to Brafman personally, such as a name at the top of the interface.[63] The Commonwealth laid no

---

[62] *Id.* at *6.

[63] Which could still be highly superficial, considering how easy it is for people to manufacture messages and label them by a name other than the actual sender. Cell phones allow you to identify phone numbers by whatever "name" the user desires. One could claim to be in touch with Winston Churchill by labeling a true number as "Sir Winston" in their phone contacts. That alone would not support the fact of the matter. The law requires more. The contact name is, at least by itself, a bare assertion of identity and is minimally probative.

foundation as to Brafman's ownership of the phone number. Sova merely asserted that Brafman sent the messages.

There is also no timestamp by which any time or date can be even superficially associated with these messages, individually or as a series, making it unclear whether the statements are relevant to the case at hand.[64] Nothing contextualizes the messages linking them to Brafman's charges, and there is no other evidence that reveals to whom, other than perhaps "David" himself, the messages purportedly refer.[65] In particular, it is not apparent and it was not proven that the racial expletive referred to any of the victims. Even if we assume the screenshot's authenticity, the crucially relevant circumstances surrounding the text messages are just left to inference. They were not even briefly addressed at trial by testimony or supporting exhibits.

The trial court abused its discretion in admitting the screenshot because the Commonwealth presented nothing to authenticate the messages as being typed and sent by Brafman and presented insufficient evidence of context.

---

[64] Contextualizing evidence like this is crucial to reliability and is in fact required. *See Thomas v. Commonwealth*, 153 S.W.2d 835, 837 (Ky. 1977) (requiring it be proven that "the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission"). Figuratively speaking, we look not just for any smoking gun, but *the* smoking gun used in the crime in question. *See* 2 MCCORMICK ON EVIDENCE § 212 (8th ed.) ("For example, in a prosecution for possession of an illegal substance, if a plastic bag of white powder is offered into evidence, the government would assert that the bag is relevant both because the defendant possessed the bag and because its contents are illegal. The requirement of authentication would be satisfied by evidence sufficient to support a finding that it is the very bag that was seized from the possession of the defendant. *It is this 'connection' to a person* that is commonly proved to identify or authenticate the exhibit.").

[65] *Johnson*, at 566 ("[KRE 901] treats preliminary questions of authentication and identification as matters of conditional relevance according to the standards of KRE 104(b).") (citing *U.S. v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994)) (internal quotations omitted).

While the threshold for authenticating writings is generally low,[66] the susceptibility of cellular messages and screenshots to quick fabrication and alteration requires a more discerning eye from the trial court and more than mere assertions by a lay witness that they were sent by the criminal defendant.[67]

### 2. If the screenshot were authenticated, admitting it for non-propensity purposes would not violate KRE 404.

We will not reach the KRE 404 issue in depth for two reasons. First, the screenshot was not properly authenticated in the first place under KRE 901, making it inadmissible from the start. Second, even if it had been authenticated, the messages could have been used for non-propensity purposes.[68] KRE 404(a) generally proscribes use of past acts to prove criminal propensity. But the messages, had they been properly placed in the context of this crime, could be properly admitted proving the identity of the perpetrator, to prove or contradict Brafman's disputed criminal intent, or even to make a

---

[66] *Id.*

[67] *See Beason v. Commonwealth*, 548 S.W.2d 835, 837 (Ky. 1977) ("If the offered item possesses characteristics which are fairly unique and readily identifiable and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. *On the other hand,* if the offered evidence is of such a nature . . . to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation.") (quoting 2 MCCORMICK ON EVIDENCE § 212, p. 527 (1972)). These principles still hold completely steadfast, and are perhaps *stronger* today, in light of technological advancements. Trial courts must understand how easy it is for anyone to present themselves as someone they are not on social media, in anonymous online forums, or through cell phone communication, or to use such technology to manufacture a profile in someone else's name. Additionally, texts and chats can be selectively solicited or deleted by the recipient at will. These are the sorts of realities that require the trial court pay closer attention when such evidence is presented to it.

[68] KRE 404(b)(1).

case for primary racial motivation under KRS 532.031.[69]  So no violation

occurred under KRE 404.

### F. Admitting the phone calls was error, but harmless error.

Two sound recordings of Brafman's phone conversations at the jail were

admitted at trial.  Brafman does not dispute the authenticity of the sound

recordings, she asserts only that they are irrelevant to the charges and that in

any case their prejudicial effect outweighs their probative value.  The

Commonwealth counters that they were relevant to Brafman's state of mind

immediately following her arrest, especially as to whether she had truly

forgotten her actions as asserted at trial, or as admissions of guilt.  We agree

with Brafman as to the first phone call on relevancy grounds, but we do not

agree that the second phone call was either irrelevant or unduly prejudicial.

In general, all relevant evidence is admissible.[70]  Evidence is relevant if it

is probative and material.[71]  Evidence is probative if it tends to make a matter

of fact even slightly more or less likely,[72] and it is material if that matter of fact

pertains to an issue in dispute at trial.[73]  But, even relevant evidence may be

excluded if its probative value is substantially outweighed by unfair

prejudice.[74]  Unfair prejudice is that which, among other things, makes the

jury decide issues in emotional or irrational ways, is unnecessarily cumulative,

---

[69] KRE 404(b).

[70] KRE 402.

[71] KRE 401.

[72] *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky. 2015).

[73] *Dunlap v. Commonwealth*, 435 S.W.3d 537, 592 (Ky. 2013).

[74] KRE 403.

26

confuses the issues, or wastes time.[75]  Determining the relevancy and

admissibility of evidence is a discretionary function of the court, and error will

be found only if the court abuses its discretion.[76]

### 1. The first phone call was largely irrelevant, but admitting it was harmless error.

The first phone call on May 15 was between Brafman and an unidentified

male voice:

> Male: What have you gone and done?
> Brafman: Oh my god, (laugh) I rather not say.
> Male: I heard on the news, one.
> Brafman: Yeah, awful.
> Male: Radio said, Arson one.
> Brafman: Said what?
> Male: Arson.
> Brafman: Yeah (laugh).

As to this first recording, the trial court did not abuse its discretion, as it

is at least slightly probative of Brafman's ability to remember what she had

done.  Brafman argues she was simply acknowledging what had been said on

the news—that she had been charged with first-degree arson—because that is

what the male voice inquired about.  We do not think that it is an admission of

guilt as the Commonwealth argues, but it may be slightly probative of certain

issues in the case.

---

[75] KRE 403; *Webb*, 387 S.W.3d at 326.

[76] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

But even if Brafman's statements were relevant as an admission, Brafman largely stuck to her defense narrative at trial[77] that she acknowledged setting the fire but that she was too intoxicated to form criminal intent. That Brafman committed the act was practically stipulated, removing the identity of the perpetrator from issue. While Brafman's laughter was not very strongly prejudicial, at least considering Brafman's general demeanor at trial, it is not otherwise probative of any material issue at trial. The phone call was also unnecessarily cumulative under KRE 403 since Brafman's chosen defense was not to dispute that she had started the fires. It was error to admit this.

But admitting it was harmless error. This recording likely did not affect the conviction or sentence. It was relatively clear already that Brafman set the fire, and while Brafman argues that her laughter in the recording made her seem gratuitously cold and unfeeling to the jury, we do not think that this is likely to have changed the jury's first-hand impression of Brafman enough to alter its verdict and recommendations.

### 2. *The second recordings were also not relevant but admitting them was harmless error.*

As to the second recording of a phone call made May 20, there is more room for disagreement, but still not enough to find admitting it to be an abuse of discretion. The Commonwealth's Exhibit 12 transcribes three different statements:

a. "… and I hate to f***** do something stupid again."

---

[77] We say that she largely stuck to her story because there was a moment that she wavered as to whether she started the fire but ultimately accepted the narrative that she had but that she just could not remember.

28

b. "didn't know, stupid, I burnt my son's sh\*\*, I have my ID and my bank card."

c. "climb through the f\*\*\*\*\* windows and sh\*\*, I'll have to f\*\*\*\*\* try to hurt 'em again when I get out."

The Commonwealth presented these statements to the jury by audio playback in the courtroom, controlled from the Commonwealth's Attorney's phone, with gaps and pauses between each discrete playback. Only these statements from Brafman were played. No other voices or conversation relating to these statements were played for the jury.

Brafman's statements do not refer to the crimes charged. Nothing from the statements themselves establishes, and the foundational witness testimony did not indicate, what Brafman was really talking about in these statements. Presumably, if fuller recordings were played or the testifying witness elaborated, the statements would clear the low relevance threshold. But what "something" Brafman was referring to is anyone's guess. While she refers to burning her son's belongings, that is on its own irrelevant to the crime charged since nothing at trial or in the record involves her son's belongings. At most, it was probably used as inadmissible evidence of pyromaniacal tendencies.[78] And while she expresses an urge to violence toward someone, it is not evident in any way that she is referring to the victims in this case.

Perhaps on retrial, assuming a foundational context is laid for these statements, the first and third could be relevant. The first is relevant to Brafman's identity as the fire-setter, assuming the "something stupid" she

---

[78] *See* KRE 404(a).

29

referred to was the arson and not something else.  The second is possibly relevant, but it must be at least minimally established that she is referring to the victims.  This would be relevant to intent, because it admits that she would "try" again, implying she tried to hurt the victims in the first attempt.  It may also be relevant to sentencing.

Ultimately, while these recordings certainly did not lift the jury's perception of Brafman, we cannot say that it had a substantial likelihood of changing the jury's verdict.  For one, the recordings were very hard to understand in the first place.  Having the transcript now helps our review, but it is unlikely they were understood and retained by the jury very well when they were first presented at trial.  Rather, it was the testimony of all the witnesses, including Brafman's, that otherwise supports the verdict.

### G. The cumulative error doctrine does not apply, because one error was enough to require reversal.

Finally, Brafman asserts that if the asserted errors do not individually warrant reversal, then the cumulative effect of the errors requires reversal.  Under this doctrine, the cumulative effect of multiple errors must, though individually insufficient, render the trial fundamentally unfair to warrant reversal.[79]  There are multiple errors in this case, but the prosecutorial misconduct was enough to warrant reversal.  Therefore, we have no reason to determine whether the cumulative effect of the other errors would require reversal.

---

[79] *Id.* (citing *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010)).

## IV. CONCLUSION

The prosecutorial misconduct was flagrant enough to render the trial fundamentally unfair, simultaneously leading the jury to conclude facts contrary to the known facts of the case while depriving Brafman of an ability to present her defense to the jury. For this, we reverse and remand the case to the trial court for further proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kayla Danielle Deatherage
Emily Holt Rhorer
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Thomas A. Van de Rostyne
Assistant Attorney General